In re COUNTRY STORE PRODUCTS, INC., Debtor.

COUNTRY STORE PRODUCTS, INC., Plaintiff,

v.

CORNUCOPIA PRODUCTS, INC. t/a Cornucopia Candles, Defendant.

Bankruptcy No. 80–01779K.
Adv. No. 81–1548K.

United States Bankruptcy Court, E. D. Pennsylvania.

July 1, 1980.

Gary M. Schildhorn, Philadelphia, Pa., for debtor/plaintiff.

Brian J. O'Neill, Philadelphia, Pa., Trustee.

Wayne N. Cordes, Newtown, Pa., David Freeman, Philadelphia, Pa., for defendant.

Dan S. Lossing, Bala Cynwyd, Pa., for intervenor/Continental Bank.

Vito F. Canuso, Philadelphia, Pa., for trustee.

## OPINION

WILLIAM A. KING, Jr., Bankruptcy Judge.

This adversary proceeding is brought before this Court by Country Store Products, Inc. seeking an order to compel the defendant to turn over to the plaintiff certain candle manufacturing equipment. Specifically, the plaintiff, a debtor-in-possession, having filed a voluntary petition pursuant to Chapter 11 of the Bankruptcy Code on July 25, 1980, contends that it possesses rights in special taper-making equipment. Conversely, defendant responds, in conjunction with the intervening defendant, Continental Bank, that the aforesaid claimed rights of the plaintiff in the machinery are superceded by a perfected security interest of Continental Bank in the assets of Cornucopia Candles.[1]

To resolve this conflict, the sole issue before the Court today, therefore, is whether the equipment in question was leased to the defendant by the plaintiff or whether Country Store sold this equipment to Cornucopia. If only a lease existed Continental Bank's perfected security interest is worthless because Cornucopia itself lacked an interest in the equipment which it could pledge as security to the Bank. If a sale occurred, however, the plaintiff's request for turnover would be denied because of Continental Bank's superior security interest. Based on the evidence and testimony presented to this Court, we hold that a sale of said taper-making equipment has tran-spired. Therefore, plaintiff's request for turnover of said equipment must be denied.

Prior to 1980, Country Store was an importer of merchandise in the gift business which included the manufacture of candles for distribution to retailers. However, in January of 1980, Country Store began to experience financial difficulties. In an effort to improve its cash flow situation, Country Store, directed by Robert Ball and Richard Ball, ceased manufacturing candles. Subsequently, an agreement was reached between the Balls, Roy Rhodes (manager of the candle department) and Robert Riley (another employee) in which Country Store permitted Rhodes and Riley to use their candle-making equipment; the only compensation sought by Country Store was to be supplied with a steady source of candles.

During this time, Country Store actively pursued a buyer for this equipment. Robert Riley negotiated with Country Store until February of 1980 when it was agreed that should he be able to secure certain accounts, the plaintiff would sell the equipment to him. When Riley was in fact able to secure the specified supply contracts in early February of 1980, arrangements were made through which Riley (now operating in a 50–50 partnership with Roy Rhodes and trading as Cornucopia Candles) would purchase the taper-making equipment.

Under the terms of this agreement, the purchase price of the taper-making equipment, valued in excess of $113,000, was to be paid over a period of time, from merchandise shipped by Cornucopia to the plaintiff. Specifically, whenever Cornucopia shipped candles to Country Store, it was agreed that the plaintiff would pay only 75 per cent of the total invoice, crediting the remainder toward the total purchase price of the equipment. The parties utilized this system of payments to reduce the outstanding debt from $109,000 to $45,981 during the period from February of 1980 through January of 1982. Although the plaintiff

---

1. This Opinion constitutes the findings of fact and conclusions of law required by Rule 752 of the Rules of Bankruptcy Procedure.

does not deny that these payments were made, it contends that these payments were not installments reducing the balance of the purchase price, but instead, rental payments. While the plaintiff's argument appears plausible on the surface, it is highly improbable when viewed in light of the evidence.

Perhaps the most damaging evidence which contraverts the plaintiff's position arises out of the original complaint which unequivocally stated that a sale had transpired. According to paragraph three (3) of the complaint, the plaintiff agreed to sell to the defendant all of the plaintiff's candle-making equipment which formerly had been located at the plaintiff's place of business.[2] Based on this agreement plaintiff's initial complaint prayed for turnover of the equipment because of the failure of defendant to remit payment.

Most interesting, however, was the fact that this complaint was accompanied by a sworn affidavit subscribed to by Richard G. Ball, the Secretary-Treasurer of the plaintiff-corporation. This affidavit stated that the "facts contained in the foregoing complaint are true and correct to the best of my information, knowledge and belief." It must be stressed that, in his capacity as Secretary-Treasurer, no one should be more qualified and knowledgeable of Country Store's financial transactions and relationship with Cornucopia than Richard G. Ball.

Why then did the plaintiff amend this complaint at trial which completely altered its alleged right of recovery from that based on a default of an executed sale to violation of a lease agreement? Quite simply, Continental Bank (in July of 1981) advanced over $90,000 to Cornucopia and secured the loan by a security agreement and financing statements executed by Cornucopia and duly filed, covering Cornucopia's machinery and equipment. Even if the plaintiff could establish the existence of a sale, its rights to this equipment, as an unsecured creditor, now were inferior to those of Continental Bank a secured creditor with a perfected security interest. Accordingly, the only way to circumvent the perfected security interest of Continental Bank was to claim that a lease existed. Such irresponsible conduct is abhorrent to the Court.

Even assuming, *arguendo*, that the foregoing conduct was proper, the plaintiff has utterly failed to meet its burden of proof that a lease existed. In fact, the weight of the evidence and testimony submitted before this Court, support the defendant's contention that a sale occurred, which the plaintiff has been unable to rebut with any degree of credibility. Specifically, there is the cancelled check for $1,000 which was tendered by Cornucopia as a deposit on the equipment and acknowledged as such by the plaintiff in correspondence dated February 15, 1980.[3] There is an invoice dated February 26, 1980 [4] which sets forth in writing the sale of the disputed equipment from Country Store to Cornucopia for the agreed price of $109,239.32. The plaintiff's only rebuttal is feeble at best; this document only represented a memo or a so-called "*pro forma*" invoice. And finally, there is the plaintiff's attempt to convince this Court that a lease for three (3) months should be viewed as operational for the duration of Cornucopia's candle-manufacturing enterprise.[5] This is an affront to the Court. The lease in question was to run from October 1, 1980 to December 31, 1980 and was to include the use of both the equipment and

---

**2.** Paragraph 3. The sale was made pursuant to the following terms:
    (a) The machinery was to be delivered by the plaintiff to defendant at the defendant's place of business.
    (b) Defendant was to pay plaintiff for the machinery by manufacturing candles without charge to plaintiff, pursuant to plaintiff's written orders. With each shipment of candles received by plaintiff, defendant's indebtedness to plaintiff would be reduced by the agreed number, 25 (25%) per cent of the amount of each invoice.

**3.** Submitted into evidence as D–3.

**4.** Submitted into evidence as P–1.

**5.** Submitted into evidence as P–2. Also, see Notes of Testimony from hearing held on January 21, 1982, page 86.

the building. It is inconceivable that this lease could apply to the rental of the taper-making equipment either for the period of ten (10) months prior to its creation or for the twelve (12) months subsequent to the termination of the lease. What is even more incredible is that, even if a lease was in existence to cover this time span, Country Store would allow the defendant to use its equipment (valued at over $100,000) for almost two (2) years free of charge. However, in reality, Country Store did not enforce the "lease" not because of Cornucopia's precarious financial predicament, but because Country Store was already withholding at least twenty-five (25%) per cent of the payment due on Cornucopia's monthly shipment of candles pursuant to the financing agreement discussed above.

■ The actions of the parties also aid in verifying the existence of a sale of the taper-making equipment. The courts of Pennsylvania have consistently held that the acts of the parties may be utilized in ascertaining not only the existence of a contractual relationship, but the terms and conditions of their agreement as well. "The existence of a contractual relation, the terms of the oral contract and the assent of the parties to it may be shown by their acts and the attending circumstances as well as by the words they have employed." *Yezbak v. Croce*, 370 Pa. 263, 266, 88 A.2d 80 (1952).

■ Numerous such acts and activities existed in the case at hand. In addition to the $1,000 deposit check and an invoice documenting the sale as previously discussed, Cornucopia filed financial statements at the end of 1980 which delineated this taper-making equipment as an asset and documented the payment obligation as a note payable,[6] neither of which would have been true if the equipment was merely leased. Also, Cornucopia applied for and received a loan of more than $90,000 from Continental Bank which was protected by a security agreement in the subject equipment. The purpose of this loan was to undertake the expensive and arduous task of installing the taper-making equipment on Cornucopia's new site, hardly an activity that would be undertaken if such equipment had been rented. When viewed in the aggregate, these activities clearly evidence the existence of a contract of sale for this equipment.

■ As a footnote, the Statute of Frauds argument which the plaintiff espouses is inapplicable. Even assuming that the contract does not satisfy the criteria set forth in U.C.C. 2–201(1) which requires "some writing sufficient to indicate that a contract for sale has been made and signed"[7] (the existence of which has been proven) this transaction would still be valid as it clearly fits within the exceptions set forth in U.C.C. 2–201(3)(c). This provision states that a contract which does not meet the standards of 2–201(1) is enforceable "with respect to goods for which the payment has been made and accepted or which have been received and accepted."[8]

Finally, the plaintiff has attempted to impress upon the Court that a lease did exist previously through the testimony of Roy Rhodes, a fifty (50%) percent partner in Cornucopia Candles. However, while this testimony was introduced previously to undermine the defendant's contention of a sale, it has in fact proved to be more damaging to the plaintiff. Because of gross inconsistencies, we have been unable to confer any credibility upon Rhodes' testimony.

Prior to trial, Roy Rhodes considered the taper-making machinery unequivocally to be the property of Cornucopia. Proof of this position was evidenced in the financial statement of Cornucopia for the period ending December 30, 1980. As discussed above, although Roy Rhodes personally reviewed the balance sheet which indicated over $113,000 in machinery assets (the value of the taper-making equipment), he never no-

---

6. Submitted into evidence as I–1.

7. 13 Pa.Cons.Stat.Ann. § 2201(a) (Purdon 1982).

8. 13 Pa.Cons.Stat.Ann. § 2201(c)(3) (Purdon 1982).

tified the accounting firm, or anyone else that this entry was erroneous.[9] In addition, Rhodes failed to take similar action with respect to a note payable documented in the same financial statement owed to Country Store. This action, or lack thereof, was tantamount to an acknowledgment by Roy Rhodes, who was intimately involved in the operations of Cornucopia, that a purchase obligation rather than a rental agreement existed.

At trial, however, Rhodes claimed that the taper-making equipment was rented, not purchased. This Court finds this complete reversal to be largely attributable to the vested interest that Rhodes has in a judicial finding that Country Store is the rightful owner of the disputed equipment. As adduced from the testimony, Rhodes presently has an arrangement with Country Store whereby he will become plaintiff's primary supplier of candles.[10] In addition, he has removed certain equipment from the Cornucopia factory (after Cornucopia filed a Chapter 11 Bankruptcy Petition, in violation of the Bankruptcy Code) and has delivered that equipment to plaintiff's place of business.[11] Rhodes' avowed intent is to utilize the very equipment which is in issue.[12] It is apparent, therefore, that Roy Rhodes has a very keen interest in the disposition of this equipment and has tailored his testimony accordingly. As a result, this Court finds that his testimony lacks any degree of credibility.

For these reasons, therefore, we must deny plaintiff's prayer for relief. This Court finds that a sale of taper-making equipment had occurred. After the sale, the intervening defendant, Continental Bank, acquired and perfected a security interest.

An appropriate Order will be entered.

---

**9.** Notes of Testimony from hearing held on February 9, 1982, pages 174–177.

**10.** Notes of Testimony from hearings held January 21, 1982 and February 9, 1982, pp. 103, 105–106, 162–162.

**11.** Notes of Testimony from hearings held January 21, 1982 and February 9, 1982, pp. 103, 105, 167–168.

**12.** Notes of Testimony from hearing held January 21, 1982, p. 106.