PUBLIC SERVICE ENTERPRISE GROUP INCORPORATED and Public Service Electric and Gas Company, Plaintiffs,

v.

PHILADELPHIA ELECTRIC COMPANY, Defendant.

ATLANTIC CITY ELECTRIC COMPANY and Delmarva Power & Light Company, Plaintiffs,

v.

PHILADELPHIA ELECTRIC COMPANY, Defendant.

Civ. Nos. 88–3214(G), 88–3286(G).

United States District Court, D. New Jersey, Camden Vicinage.

Feb. 21, 1990.

John B. LaVecchia, Kevin R. Gardner, Connell, Foley & Geiser, Roseland, N.J., and J.A. Bouknight, Jr., and Douglas G. Green, Newman & Holtzinger, P.C., Washington, D.C., for plaintiffs, Public Service Enterprise Group Inc. and Public Service Elec. and Gas Co.

George G. O'Brien, Dechert, Price & Rhoads, Princeton, N.J., and Richard C. Rizzo, Fred T. Magaziner, Kathryn L. Connelly, James P. Weygandt, and Lawrence J. Goode, Dechert Price & Rhoads, Philadelphia, Pa., for plaintiffs, Atlantic City Elec. Co. and Delmarva Power & Light Co. (James E. Franklin, III, Megargee, Youngblood, Franklin & Corcoran, P.A., Pleasantville, N.J., and Dale G. Stoodley, Delmarva Power & Light Co., Wilmington, Del., of counsel.)

Warren W. Faulk, John J. Mulderig, Brown & Connery, Westmont, N.J., and Richard C. Warmer, John H. Beisner, Saone B. Crocker, and Stuart L. Fullerton, O'Melveny & Myers, Washington, D.C., for defendant, Philadelphia Elec. Co.

## OPINION

JEROME B. SIMANDLE, United States Magistrate:

### I. *Factual Background and Procedural History*

This breach of contract action is before the court upon motion by defendant Philadelphia Electric Company ["PECo"] to compel plaintiffs Public Service Enterprise Group, Incorporated and Public Service Electric and Gas Company ["Public Service"] and Atlantic City Electric Company and Delmarva Power & Light Company ["Atlantic/Delmarva" (for purposes of motion only)] to answer certain interrogatories pursuant to Rule 37(a), Fed.R.Civ.P. Resolution of this motion requires construing whether the disputed interrogatories of the defendant are relevant to the issue of course-of-performance of the parties' conduct in interpreting the contracts between them, as discussed below. If these matters are found to be relevant, an assessment must also be made as to their proportionality to the issues in dispute and the legitimate needs of the parties at this stage of the litigation, under the rule of proportionality in Rule 26(b)(1), Fed.R.Civ.P.

The procedural context of this motion is briefly discussed.[1] Plaintiffs Public Service and Atlantic/Delmarva filed complaints, subsequently consolidated, against defendant PECo, alleging that PECo has failed to perform its contractual management duties as the operator of the Peach Bottom, Pennsylvania, Atomic Power Station. PECo's alleged mismanagement is claimed to have caused the U.S. Nuclear Regulatory Commission to shut down the Peach Bottom plant in March, 1987. The complaints allege acts by PECo of reckless and intentional misconduct and mismanagement of PECo executives and employees, including mismanagement leading to the NRC's finding that the operating crew of Peach Bottom's nuclear control room were asleep with no one aware at the controls. The complaints allege that the NRC compelled the temporary closure of the plant, which has persisted for more than two years, due to PECo's mismanagement, resulting in the forced resignations of the top two executives of PECo and a resolution by PECo's board of directors to permit shareholders to pursue a derivative suit for mismanagement against those former PECo executives. The shutdown and delayed start-up of Peach Bottom have allegedly caused Public Service and Atlantic/Delmarva to incur damages reflected in, among other things, replacement costs for their shares of lost Peach Bottom electric power and other costs.

The underlying contract is the Peach Bottom Owners Agreement [reproduced at Tab 5 of PECo's Brief]. Under Art. 2.1 of

---

1. A more complete discussion appears in the Opinion of the Honorable John F. Gerry, filed August 24, 1989, concerning defendant PECo's motion to dismiss the complaints. *Public Service Enterprise Group v. Philadelphia Electric Co.*, 722 F.Supp. 184 (D.N.J.1989).

the Peach Bottom Owners Agreement, the   ownership shares are:

Atlantic City Electric Company ........................................7.51%
Delmarva Power & Light Company .....................................7.51%
Philadelphia Electric Company .......................................42.49%
Public Service Electric and Gas Company ............................42.49%

---

Under Art. 11.1 of the Agreement, PECo has responsibility for the operation of the Peach Bottom Station, as this clause provides in part:

In providing such operation and maintenance, *PE shall act as an independent contractor responsible for the result to be obtained, i.e., generation of power and energy at the Station, as economically and reliably as is practicable,* and delivery to the adjacent Peach Bottom Switching Station, PE itself having *sole responsibility* for the specific manner of attaining that result, subject to the provisions of 5.2 and 5.3 [concerning co-owner approvals for certain capital additions and operating expenditures]. [Emphasis added.]

Plaintiffs allege, among other things, that PECo has breached its "independent contractor" duty to generate power "as economically and reliably as is practicable."

The meaning of Contractual provisions in the Peach Bottom Owners Agreement concerning sharing of liability and costs among the co-owners are in dispute. In PECo's view, the co-owners agreed to share all expenses and production, and PECo was to receive no payment or other benefit for its services as the Peach Bottom operator. In keeping with this arrangement, in PECo's view, the operator bears no responsibility for costs incurred by the other co-owners as a result of complete or partial outages at Peach Bottom. Also, according to PECo, the operator is not responsible for station-related costs of a co-owner that are disallowed by a rate-making authority or otherwise not included in the co-owners' rate base even if such costs are not deemed to have been prudently incurred, that is, even if caused by the operator's neglect or mismanagement. PECo alleges that all co-owners mutually agreed to share in the benefits of the generator sta-

tion and in the risks of liability arising from the operation of the station. The understanding among co-owners since 1971, according to PECo, was that all co-owners would bear its *pro rata* share of the financial consequences of power outages, whether or not caused by the operator's gross negligence. [See PECo's Brief at 3–9.]

Peco points to the amendment to the Peach Bottom Owners Agreement, dated January 26, 1977, which added a new Article 25.1 as follows:

All power replacement costs incurred by each signatory as a result of the total or partial unavailability of its ownership share of the Station shall not be considered as a shared liability and shall be borne entirely by each signatory.

The 1977 amendment also preserved previous Article 25.2 as renumbered Article 25.3, which states:

No signatory shall be liable for the failure of any other signatory to perform any of its obligations under this Agreement.

The meaning of these contractual clauses is in dispute, as Chief Judge Gerry found in the August 24th Opinion, resulting in denial of PECo's dismissal motion.

These same parties have a second ownership agreement, almost identical to the Peach Bottom Owners Agreement, concerning the co-ownership and operation of the Salem Atomic Power Station in New Jersey. The Salem Station is operated by plaintiff Public Service, pursuant to the Salem Owners Agreement of November 21, 1971 [reproduced at Tab 6 of PECo's Brief]. PECo alleges that there have been materially similar power outages at the Salem Plant, operated by Public Service, for which all co-owners have sustained a

pro rata share of common costs, and as to which each co-owner has borne its own costs of replacement power, without seeking to recover for such losses against Public Service. PECo asserts that when the Salem Plant has been shut down or when the NRC has imposed fines upon the Salem operator, all co-owners have borne the burdens, in accordance with the Salem Owners Agreement.

Three major outages have occurred at Salem, as to which PECo seeks further discovery in this motion. *First,* in 1983, the NRC shut down the plant after two failures of the Salem Automatic Reactor Protection Program; the NRC called those events "very serious matters" [letter from NRC to Public Service, dated May 5, 1983, reproduced at Tab 7 of PECo's Brief], allegedly stemming from "significant deficiencies" in Public Service's operation, including a charge that Public Service "failed to promptly report, as required, certain events to the NRC" [*id.*]. The NRC concluded that the events "are the result of insufficient management involvement in establishing a safety perspective, and requiring attention to detail, and in ensuring procedural adherence," and the NRC imposed a civil penalty of $850,000 for what the NRC called "the 'most significant' safety failures since the nuclear incident at the Three Mile Island plant in 1979" [*id.*].

*Second,* in 1984 there was a series of forced outages at Salem Unit 1 which resulted from a generator failure, from problems with reactor head and vessel flange cleaning, and from incorrect installation of certain replacement parts, causing substantial cost to the co-owners. The NRC was not involved in this second outage.

*Third,* in October 1984 through April, 1985, there was a forced outage at Salem Unit 2 which resulted from an electrical failure caused by defects in the generator or by improperly performed repairs of the generator causing substantial damage and requiring replacement of the Salem Unit 2 generator at substantial cost to the co-own-ers. The NRC was again not involved in this third outage.

PECo alleges that the co-owners' cost sharing in connection with these three Salem outages, and the absence of any attempt by PECo, Atlantic or Delmarva to seek recovery from Public Service, are evidence of a course of performance illuminating the cost sharing provisions of the Peach Bottom and Salem Owners Agreements in cases of losses accruing from alleged operator mismanagement.

Public Service and Atlantic/Delmarva, in separate oppositions, strongly contest the significance which PECo would place upon the Salem outages. As a matter of contract interpretation, Atlantic/Delmarva argues that PECo's reading would nullify the contractual standard of Article 25.3, *supra,* which requires the operator to act "as an independent contractor responsible for the result obtained," thus giving an operator forgiveness in advance for the operator's negligent, reckless or even willful failure to carry out its explicit responsibility under the Owners Agreements. [Atlantic/Delmarva Brief in Opposition at 3–7.] Both Public Service and Atlantic/Delmarva argue that the Salem outages were not materially similar to the Peach Bottom shutdown and cannot serve as a basis for establishing a course of performance due to such dissimilarity, for several reasons. Plaintiffs allege that the central issue in the Salem shutdowns was equipment failure, not mismanagement, and that PECo itself has admitted as much in pleadings and in litigation by all the co-owners against the manufacturer of the allegedly defective Salem equipment, Westinghouse Electric Corporation. Public Service has articulated numerous examples of statements by PECo in the *Westinghouse* litigation and in Pennsylvania Public Utility Commission proceedings to the effect that Public Service acted prudently in connection with each of the Salem outages in question,[2] without exception.

---

**2.** For example, PECo joined all Salem co-owners in suits against Westinghouse concerning the first and third Salem outages, above, alleging that any harm related to the outage was caused by Westinghouse, not Public Service. When Westinghouse counterclaimed, alleging that any loss "was occasioned by the negligence and malfeasance of PSE & G," PECo denied this asser-

It must be noted that the Supreme Court of Pennsylvania reviewed the Public Utility Commission's proceedings with respect to not permitting PECo to make recovery from ratepayers of certain costs in the first and second Salem outages. [The Supreme Court's Opinion, *Pennsylvania Public Utility Commission v. Philadelphia Electric Co.,* 522 Pa. 338, 561 A.2d 1224 (1989), appears at Tab 2 of PECo's Reply Brief.] PECo has argued that the Pennsylvania Supreme Court "thus concluded that Salem management had 'acted imprudently,'" citing 561 A.2d at 1227. [*See* PECo's Reply Brief at 15.] In fact, the quoted language appears in the discussion of the appropriate legal standard for cost recovery, in which the court was critical of the Commission's employment of the term "high degree of care" instead of whether the utility "acted imprudently in failing to have appropriate maintenance and operating practices." *Id.,* 561 A.2d at 1227. With respect to the first Salem outage, the Supreme Court agreed with the Commonwealth Court's recognition that "[i]t is essentially undisputed that the defective manufacture of the coils was responsible for their ultimate failure." *Philadelphia Electric Co. v. Pennsylvania Public Utility Commission,* 114 Pa. Cmwlth. 22, 538 A.2d 98, 101 (1988). The Supreme Court also wrote that "[t]here appears to be no dispute that [PECo] played no part in the manufacturing of the defective resins," 561 A.2d at 1228. The Supreme Court reversed the Commonwealth Court not because the operator had acted imprudently, but because the utility is in "a far superior position to seek redress for the defects and negotiate contractual protections to minimize any future problems." *Id.* 561 A.2d at 1228. The Court continued: "While the utility may have to bear the initial losses incurred as a result of its contractor's negligence, it is in a far better position to aggressively pursue the tortfeasor for reimbursement." *Id.* 561 A.2d at 1228. Thus, the rationale [3] for declining to permit such costs to be passed on to ratepayers—that the utility can recoup its losses from the manufacturers of defective products—does not indicate that the Salem Plant has been found to have been mismanaged by Public Service.

PECo has not shown evidence that it believed, prior to being sued in this litigation, that Public Service committed mis- tion of Public Service's negligence. [Pleadings attached at Exhibit 6 to Public Service's Brief in Opposition.]

Before the Public Utilities Commission, PECo took the position that it should be permitted to recover for its losses in the first Salem outage because "the causes of the breaker failure, and the duration of the subsequent outage extension, were outside the control of ... PSE & G" ["Initial Brief of Philadelphia Elec. Co. at 1, Dkt. No. P–830453 (PUC July 11, 1984)," attached to Exhibit 2 to Public Service's Brief in Opposition]. Further examples of such admissions by PECo to the Public Utilities Commission are found throughout PECo's briefs before that agency [*see, e.g.,* "Initial Brief," *supra,* Exhibit 2 at 3–4, 25, 44–45, 71–72; "Exceptions of Philadelphia Elec. Co.," attached as Exhibit 3 to Public Service's Brief in Opposition, at 40–53, 57–58; "Reply Brief of Philadelphia, Elec. Co.," attached as Exhibit 4 to Public Service's Brief in Opposition, at 15, 22–25.]

The second Salem outage, involving Salem Unit 1 in 1984, was also the subject of rate proceedings before the Public Utilities Commission, in which PECo stated to the PUC:

[*All*] of the evidence introduced into the record showed that utility management acted prudently. The generator failure was due solely to a manufacturing defect that was un- foreseeable and undetectable by PECo or PSE & G.... [Emphasis in original.]

["Initial Brief of Philadelphia Elec. Co. at 128–29, Dkt. No. M–840375 (PUC Dec. 21, 1984)," attached to Public Service's Brief in Opposition at Exhibit 7]. PECo further stated to the PUC, with respect to the Unit 1 shutdown:

In sum, the uncontroverted evidence introduced during this Phase II investigation demonstrates that the 1984 generator failure at Salem I was due solely to a manufacturing defect and that management acted prudently in conducting the necessary repair and maintenance work.

*Id.* at 134–136.

3. Although the Supreme Court's Opinion is far from clear, there is a passing recognition that the Nuclear Regulatory Commission found fault with Salem's management leading to the first (1983) shutdown, stating, 561 A.2d at 1225:

The NRC investigation uncovered inadequate operations with regard to maintenance and testing of current circuit breakers and related component parts, inadequate training of operators and overall station management.

There is no suggestion, however, that poor management practices, rather than defective circuit breakers, caused the first outage.

management or gross negligence at Salem. To the contrary, PECo's pre-litigation statements on the subject affirmatively asserted PECo's view that Public Service acted prudently at Salem with respect to all three Salem outages.

In this litigation, on the other hand, PECo has asserted contingent counterclaims against Public Service seeking recovery of PECo's losses arising from each of the three Salem outages. These counterclaims were the subject of Public Service's cross-motion to dismiss the counterclaims. Chief Judge Gerry did not adjudicate the merits of the counterclaims or of Public Service's argument that PECo's statements in the *Westinghouse* litigation and Public Utility Commission hearings, quoted above, created a judicial estoppel against the counterclaims, but the Court did observe, "We do not doubt that there may be validity to this [judicial estoppel] argument ..." 722 F.Supp. at 219. Instead, Chief Judge Gerry determined that discovery and motion practice on the counterclaims should be stayed, stating, *id.* 722 F.Supp. at 220:

> These counterclaims are expressly contingent upon the plaintiffs' success in this action. As a result, we need not waste the litigants' money and effort, nor our own time, dealing with issues of a hypothetical nature. We will stay all discovery and motion practice on these counterclaims until further order.

As a result of the stay of counterclaim discovery, any interrogatories of PECo which are relevant solely to the counterclaims would be precluded at this time, while discovery concerning the Salem outages but related to PECo's contractual interpretation defenses would not necessarily be precluded. For example, PECo seeks to probe the extent of Atlantic's and Delmar-

va's knowledge concerning the Salem outages for which they assumed costs, to see whether Atlantic and Delmarva are taking an inconsistent position against PECo in the present case; PECo seeks to learn whether Public Service was aware of its own mismanagement at Salem and nonetheless sought payment from the co-owners;[4] PECo also seeks to learn whether Public Service's conduct at Salem with respect to disseminating information to the co-owners bears upon the existence and nature of any contractual duty to keep the co-owners fully informed of the status of the station. *See* PECo's Reply Brief at 3–6.

Against this background, we turn to consideration of the issues governing discoverability of the Salem-related information, as defendant seeks to compel responses by Public Service to Interrogatories Numbered 83, 92, 94, 96, 98–101, 107–110, 112–114, 116–124, 128–132, 134, 135, 138, 139, 142 and 144, and by Atlantic/Delmarva to Interrogatories Numbered 80, 82–115, 117 and 119.

## II. *Discussion of Law*

### A. *Course of Performance Information*

The parties have agreed that the Peach Bottom Owners Agreement is to be "construed, interpreted and controlled by the laws of the Commonwealth of Pennsylvania," Peach Bottom Owners Agreement, Art. 26.1. Under Pennsylvania law, the parties' course of performance may bear upon contractual interpretation, as the Supreme Court has held that the parties' "action under [an agreement] is often the strongest evidence of their meaning," and that "course of performance is always relevant in interpreting a writing." *Atlantic Richfield Co. v. Razumic,* 480 Pa. 366, 390

---

**4.** PECo points out that after the 1983 and 1984 Salem outages, the Vice President and General Counsel of Public Service wrote detailed memoranda to the effect that Public Service, as Salem's operator, did not bear "any financial responsibility to the co-owners for any non-insured or uninsurable risk, whether caused by negligence or even gross negligence," Memo to File by R. Edwin Selover, August 1, 1983 at 20, a copy of which was sent by Selover to PECo's

Eugene Bradley on January 14, 1985, copy attached at Tab 11 to PECo's Brief. From this document, PECo argues that plaintiff Public Service must have been aware of its own negligence or gross negligence in operating Salem or it would not have mounted the effort of addressing the subject of an operator's obligations under the Salem and Peach Bottom Owners agreements, see PECo's Reply Brief at 6, n. 1.

A.2d 736, 741 & n. 6 (1978), citing *Restatement (Second) of Contracts* § 228(4) (Tent. Draft No. 5, 1970) [now appearing as § 202(4)]. The use of course of performance in interpreting a contract is recognized in § 202(4) of the Restatement (Second) of Contracts (1979), which states:

> Where an agreement involves repeated occasions for performance by either party with knowledge of the nature of performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement.

The plaintiffs argue that course of performance discovery is relevant only if it shows a *mutual* understanding of the meaning of a contract demonstrated by performance on repeated occasions, citing *Automotive Devices Co. v. Automotive Devices Co. of Pa.*, 292 F.2d 663, 665 (3d Cir.1961); *Portsmouth Baseball Corp. v. Frick*, 278 F.2d 395, 401 (2nd Cir.), *cert. denied*, 364 U.S. 831, 81 S.Ct. 71, 5 L.Ed.2d 58 (1960). Plaintiffs urge that the parties' mutual *knowledge* and *acquiescence* in the repeated course of performance must be shown before the parties' conduct can be employed in interpreting their contract. The implication of mutuality of knowledge and acquiescence here is that defendant PECo would be required to show that it was the mutual belief of all parties to the Peach Bottom and Salem Owners Agreements that Public Service had engaged in misconduct in its operation of Salem, that the Agreement required cost-sharing regardless of the conduct of Public Service, and that Public Service knew of these understandings and acquiesced in them.

Defendant PECo's position, to the contrary, is essentially that only the knowledge and acquiescence of Public Service is necessary, demonstrated by Public Service's self-knowledge of its own mismanagement of Salem and its demand for cost sharing by its co-owners due to Public Service's belief that the Agreement provided for shared liability regardless of Public Service's negligence or gross negligence. If Public Service knew it mismanaged Salem and caused losses to the co-owners and yet sought and accepted repayment for such expenses, such conduct, according to PECo, would evidence the parties' mutual interpretation of the contract to the effect that such liability is to be shared by the owners.

Pennsylvania decisions have not unambiguously adopted Restatement § 202(4), as even the *Razumic* decision cites this provision only for the proposition that "course of performance is always relevant in interpreting a writing." 390 A.2d at 742 & n. 6. The course of performance cases decided under Pennsylvania law, while not deciding the issue, admit of a permissible use of a party's interpretation of contractual obligations against him particularly when his interpretation is against his own interest, as in *Z & L Lumber Co. v. Nordquist*, 348 Pa.Super. 580, 502 A.2d 697 (1985) and *Merriam v. Cedarbrook Realty, Inc.*, 266 Pa.Super. 252, 404 A.2d 398, 402 (1978). In *Z & L Lumber* the defendant's interpretation of the contract was manifested in a letter he sent to one of the parties to the lawsuit enumerating the responsibilities of the parties to the contract. His written interpretation was held against him, the court finding, 502 A.2d at 701:

> The [parties'] interpretation [of a contract] is entitled to great, if not controlling influence, and will generally be adopted and followed by the courts, particularly when the parties' interpretation is made before any controversy or when the construction of one party is against his interest.

Similarly, in *Merriam*, although not accepting "conjecture" as to the other party's state of mind, the court looked at a course of performance of the other party, citing *Foulke v. Miller*, 381 Pa. 587, 112 A.2d 124 (1955). In *Foulke*, the Pennsylvania Supreme Court held that Miller's conduct, in seeking Foulke's permission to re-enter the slag business, evidenced Miller's interpretation of the Miller–Foulke agreement in which Miller had promised not to re-enter the cinder business; Miller's conduct evidenced his construction of the agreement against his own interest and was therefore entitled to substantial weight.

Similarly, in *Major's Furniture Mart, Inc. v. Castle Credit Corp.*, 449 F.Supp. 538, 543–44 (E.D.Pa.1978), *aff'd*, 602 F.2d 538 (3d Cir.1979), the defendant sent a letter to plaintiff characterizing certain contract terms, which the court utilized as valid course-of-performance evidence contradictory of defendant's efforts in litigation to characterize the contract in another manner.

Likewise, in *In re Country Store Products, Inc.*, 21 B.R. 28, 31 (E.D.Pa.1980), a party consistently manifesting conduct that a contract involved sale of goods could not later allege an interpretation that the goods were merely leased when it sought to regain possession; again, the party's manifested belief against its own interest was given substantial weight in the construction of the contract.

■ These cases teach that another party's interpretation of its contractual obligations by a course of conduct against its later-asserted interest may be relevant to the construction of the contract under Pennsylvania law; it is not clear that the party asserting the other's course of conduct must have had knowledge of the other's interpretation and acquiesced in it at the time such conduct occurred where the other's conduct was against the other's interest. Perfect mutuality of knowledge and assent may be impossible, and should not necessarily be required, where, as here, the other party is alleged to have withheld evidence of its conduct (that is, the alleged mismanagement of Salem) from the contracting parties when it demanded performance (that is payment by co-owners). It is only common sense that a party acting under an agreement in a manner which appears to be advantageous to it may have to confront this evidence of its own interpretation of the agreement if it later complains of another party's breach for engaging in substantially identical conduct, and no Pennsylvania case has spoken to this precise issue. One commentator, however, has recognized this rule of interpretation, independent of the contemporaneous mutual assent of the contracting parties:

> The practical interpretation of the contract by one party, evidenced by his words or acts, can be used against him on behalf of the other party, even though that other party had no knowledge of those words or acts when they occurred and did not concur in them. In the litigation that has ensued, one who is maintaining the same interpretation that is evidenced by the other party's earlier words, and acts, can introduce them to support his contention.

3 A. Corbin, *Corbin on Contracts* § 558, at 256 (1960).

■ Even if the evidentiary rule would, pursuant to the Restatement § 202(4), require contemporaneous mutuality of knowledge, discovery should not be precluded so long as the present discovery "appears reasonably calculated to lead to the discovery of admissible evidence" under Rule 26(b)(1), Fed.R.Civ.P. Whether the information obtained in discovery actually results in admissible evidence of the parties' course of performance or of one party's prior interpretation against interest remains to be determined at or before he trial. It is sufficient for present purposes that discovery clearly related to plaintiffs' knowledge and belief concerning the Salem Owners Agreement's interpretation go forward as a necessary step toward the gathering of admissible evidence under *either* the theory of "mutuality of knowledge" *or* "interpretation against self-interest."

■ As applied to the present case, if Public Service manifested a belief that it was guilty of mismanagement or gross negligence causing the Salem outages and nonetheless interpreted the Agreements to require sharing of such losses among all the co-owners, then the evidence may be relevant to PECo's defense regarding Public Service's course of conduct. This presents only a limited window for discovery about the Salem outages. Whether Public Service is guilty of mismanagement or gross negligence at Salem is not the issue here; that issue remains for the contingent counterclaims. Instead, the issue is whether Public Service *had the knowledge and belief that it actually misman-*

*aged or committed gross negligence leading to the outages* when it interpreted the Salem Agreement to allow it, as the operator, to share all losses.

Further, the issue is not whether Public Service "should have known" it engaged in mismanagement or gross negligence, because conjecture as to Public Service's state of mind will not be permitted in demonstrating a course of conduct, as the above cases teach.

If Public Service had acknowledged its mismanagement or gross negligence, then its conduct in seeking the usual cost sharing for resultant losses could well be evidential of its interpretation of the operator's responsibilities to the co-owners under the Agreements, against its interest in the present case. But if it never acknowledged such misconduct, and asserted its innocence of such wrongdoing, then its conduct in passing such costs through to co-owners has no relevance to Public Service's interpretation of the operator's duties under the Agreements, regardless of its *actual* fault for such losses.

■ Similarly, Atlantic and Delmarva's actual knowledge or belief of Public Service's misconduct in managing Salem would be relevant to assessing their interpretation of the generator's duties; if Atlantic and Delmarva, believing Public Service to have engaged in mismanagement or gross negligence, determined that they could not recover against Public Service for such losses, their conduct in foregoing recovery for such losses could evidence their course of performance in sustaining shared losses even for mismanagement or gross negligence under the Salem Agreement. Such actual knowledge and decisionmaking would be discoverable by PECo, because it would be highly relevant to the parties' interpretation of the Peach Bottom Agreement, while circumstantial conjecture about what Atlantic and Delmarva "should have known" would not be discoverable.

■ This means that discovery of the underlying details of the Salem outages will be precluded as irrelevant. Details relating to delay in start-up at Salem would likewise be irrelevant. In both instances,

counterclaim discovery having been stayed as noted above, the only value of such information would have been to reconstruct whether Public Service may have committed actionable misconduct, not whether it actually believed or acknowledged itself to have done so.

B. *Proportionality*

■ A second reason counsels against permitting much of the discovery sought by PECo concerning the Salem outages, namely, the rule of proportionality. The discovery of marginally relevant evidence may be circumscribed by the court if it determines, under Rule 26(b)(1), Fed.R. Civ.P., that:

(i) the discovery sought is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive;

(ii) the party seeking the discovery has had ample opportunity by discovery in the action to obtain the information sought; or

(iii) the discovery is unduly burdensome or expensive, taking into account the needs of the case, the amount in controversy, limitations on the parties' resources, and the importance of the issues at stake in the litigation.

In reviewing the present interrogatories, as discussed momentarily, the standards of Rule 26(b)(1)(i) and (b)(1)(iii) come into play. First, the essential information about the Salem outages is readily available to PECo, and has been for years, by virtue of the PUC hearings and the *Westinghouse* litigation concerning these very events. PECo was not a stranger to those proceedings, and its blunderbuss discovery demands here seem not to recognize the substantial core of information already available and in PECo's possession. Also, plaintiffs have provided documents reflecting much of the information sought by the contested interrogatories, including documents construing or referring to the Salem Owners Agreement and amendments, documents concerning discussions pertaining to the co-owners' sharing of costs incurred in connection with

Salem and concerning Public Service's duties to the co-owners as operator of Salem, and more. [*See* Brief of Atlantic/Delmarva in Opposition, at 14.]

Second, discovery about every jot and tittle of information concerning the three Salem outages (let alone the discovery sought pertaining to other Salem events) is beyond the legitimate discovery needs of PECo. This litigation was a response by Public Service to an unprecedented managerial breakdown at Peach Bottom, resulting in allegedly hundreds of millions of dollars in losses over a period of several years of Peach Bottom's shutdown while PECo fired its top management, replaced its Peach Bottom management, and engaged in a managerial and operations overhaul largely mandated by the NRC. Plaintiffs' allegations that nothing remotely similar occurred at Salem would appear to have a substantial likelihood of correctness, especially in light of PECo's repeated assertions before the PUC and the *Westinghouse* courts (state and federal), discussed above, that Public Service was not imprudent in its management of Salem with respect to the three temporary shutdowns. The Salem shutdowns, occurring three to four years before the Peach Bottom difficulties, were apparently never alleged to be the product of Public Service's mismanagement, until now. The discovery sought about Salem is largely disproportionate to the course of performance issues in this case, even taking into account the significance of the substantive issues measured in institutional terms, as Rule 26(b)(1)(iii), above, requires.

This is not to say that the merits of the underlying dispute are to be adjudicated in a discovery motion. Clearly, "[o]bjections to interrogatories may not be used . . . as a vehicle for having the court decide the issues presented on the merits of the case." 6 C. Wright & A. Miller, *Federal Practice*

*and Procedure* § 2174 at 549–50 (1970), *citing U.S. v. 216 Bottles of Sudden Change,* 36 F.R.D. 695 (E.D.N.Y.1965); *Curtis v. Loew's,* 20 F.R.D. 444 (D.N.J. 1957). But no discovery device can be used by defendant to create a substantial sideshow investigating plaintiff's alleged misconduct after a history of praising plaintiff's performance and without proffering new information which has dimmed the defendant's praises, other than this litigation. This is the sort of tactic that the rule of proportionality was meant to control, especially in a case such as this one that has already fallen about nine months behind the discovery schedule set at the first Case Management Conference,[5] due to the ever-continuing production of hundreds of thousands of documents

With these precepts in mind, we consider the specific interrogatories in dispute, in essentially the order and groupings set forth in movant's Brief.

### C. *The Interrogatories*

1. Interrogatory Nos. 83, 86, 89 and 92 to Atlantic/Delmarva and Nos. 92, 94, 96 and 98 to Public Service

These generally require plaintiffs to provide any evaluation or analysis they made of the reasons for or causes of each of the three major Salem outages. The first three interrogatories to Atlantic/Delmarva and the first three to Public Service concern the three major Salem outages respectively, taking the form: "Please state whether you performed, created, prepared or assembled any evaluation, inspection, assessment or analysis of the reasons for or causes of the [indicated] Salem shutdown," and, if so, give six items of information, including who performed it, when, the substance, persons with whom it was discussed outside the company, and identify all documents memorializing it and concerning it.

---

**5.** Under the first Scheduling Order (filed February 7, 1989), written discovery including the major interrogatories and document production requests was to be completed by June 15, 1989. This deadline was extended until September 15, 1989, as the parties labored to exchange hundreds of thousands of pages of documentation, as described in the Joint Status Report and Scheduling Stipulation (filed May 19, 1989). Again, the surge of documents discovery required further extensions of time, reflected in the Joint Status Report and Scheduling Stipulation filed September 20, 1989.

PECo's Interrogatory No. 92 to Atlantic/Delmarva inquires whether any such analysis of reasons for the causes of the Salem outages was received from other sources and interrogatory No. 98 to Public Service requests the same of Public Service.

To the extent the discovery seeks information about plaintiffs' respective assessments or analyses of the reasons for the Salem shutdown, and if limited to the period of time consumed by the course of performance in sharing the costs among co-owners prior to this litigation, then such assessments or analyses of reasons are relevant to plaintiffs' actual knowledge regarding the operator's mismanagement or gross negligence. "Inspections" are not discoverable in this context, as they would fall into the details of the incidents themselves. Similarly, analyses received by Atlantic/Delmarva concerning the causes of the Salem shutdowns (No. 92 to Atlantic/Delmarva), or by Public Service (No. 98 to Public Service) could lead to discovery of plaintiffs' knowledge or belief that mismanagement or gross negligence of Public Service was the cause, thus raising an issue as to whether Atlantic/Delmarva interpreted the Agreement to preclude suits for such operator misconduct, and whether Public Service believed that such misconduct would not violate its duties as operator under the Agreement.

Because the information in this narrowed request is at the core of plaintiffs' knowledge or acknowledgement of operator misconduct, if any, the discovery will be compelled. Accordingly, as narrowed herein, Atlantic/Delmarva shall answer *Nos. 83, 86, 86 and 92* and Public Service shall answer *Nos. 92, 94, 96 and 98.*

2. Interrogatory Nos. 110, 111 and 112 to Atlantic/Delmarva and Nos. 116, 117 and 118 to Public Service

These interrogatories ask plaintiffs to state the factors which they believe contributed to each of the three major Salem outages, and all the facts upon which each factor is based, including identifying all persons with knowledge and all related documents. This set of interrogatories goes to present litigation positions, rather than historic beliefs of plaintiffs, concerning the contributing factors. These interrogatories are of doubtful relevance to the plaintiffs' course of performance in 1983–84, and their scope is so broad as to envelop all documents concerning the causes of the outages. This remains for discovery if the stay regarding counterclaims is lifted; it is disproportional to present discovery needs. The motion is *denied* with respect to *Nos. 110, 111 and 112* (Atlantic/Delmarva) and *Nos. 116, 117 and 118* (Public Service).

3. Interrogatory Nos. 113, 114 and 115 (Atlantic/Delmarva)

These interrogatories request plaintiffs Atlantic and Delmarva to identify documents which they have submitted to any state or federal regulatory agency concerning any of the three major Salem outages. Atlantic/Delmarva objected on grounds of relevance, but have not specifically discussed these interrogatories in their opposition papers. Such documents may contain relevant information if they show Atlantic or Delmarva's belief or knowledge of the cause of the Salem outages, as discussed above, or if they contain an assessment of the viability of seeking recovery from the operator (Public Service) under the Agreement. Identifying this body of documents already submitted to state or federal regulators should not be difficult. The motion is *granted* with respect to *Nos. 113, 114 and 115* (Atlantic/Delmarva).

4. Interrogatory Nos. 119, 120, 121, 122, 123, 124, 128, 129, 130 and 134 (Public Service)

Interrogatory Nos. 119–124, 128–130 and 134 seek further details about the causes of the three Salem outages, including information about Public Service's maintenance practices and repair work conducted in the period preceding the outages. PECo seeks identification of all documents referring to, and persons participating in, maintenance and repair procedures at Salem Units 1 and 2 during various periods from 1983 through 1986 [Nos. 119–124]. These facts, about

what maintenance and repair procedures were followed, are not relevant to course of performance issues; these interrogatories instead probe historic facts in an effort to detect blame after the fact, which is the purpose of counterclaim discovery, now stayed, and not course of performance under the Agreement.

· Two interrogatories [Nos. 128 and 129] request Public Service's comment as to truth and reasonableness of each statement contained in "Restart Safety Evaluation Report" and the "Generic Implications of ATWS Events at the Salem Nuclear Power Plant" and in the NRC's May 5, 1983 "Notice of Violation and Proposed Imposition of Civil Penalties." Public Service's objections of overbreadth and undue burden are sustained.[6] These overbroad and undifferentiated interrogatories would transform three technical documents into a set of perhaps several hundred requests for admission, with corollary interrogatories to identify all facts, documents and persons relied on to support a denial, and to express a contention as to whether any admitted statement amounts to a breach of the Owners Agreement for which Public Service may be held liable. The overbreadth of this unfocussed discovery request is obvious, the relevance of most of the information to the course of performance issue is doubtful.

The last [No. 134] asks Public Service whether it changed its policies following the 1983 Salem shutdown with respect to training of circuit breaker maintenance personnel, maintenance of circuit breakers, or quality control for circuit breaker maintenance and safety, and it requests Public Service to identify all documents concerning the changes. This again is largely of marginal relevance to course of performance issues. Any assessments or analyses by Public Service of reasons for the outages that may be contained in documents

sought in No. 134 would already have been discovered under No. 92, discussed above.

For these reasons, the motion is *denied* with respect to *Nos. 119, 120, 121, 122, 123, 124, 128, 129, 130 and 134* (Public Service).

**5. Interrogatory No. 131 (Public Service)**

This interrogatory asks about Public Service's policy concerning compliance with NRC regulatory guidelines. The interrogatory is non-specific and irrelevant for present purposes. The motion is *denied* as to *No. 131* (Public Service).

**6. Interrogatory No. 135 (Public Service)**

PECo seeks all communications by the NRC prior to the 1983 Salem shutdown that insufficient management attention was being provided at Salem. This interrogatory draws its focus squarely to NRC allegations of mismanagement, if any, prior to the 1983 Salem shutdown. Although the NRC criticism itself would not be admissible to establish Public Service's belief or acknowledgement of its mismanagement or gross negligence for course-of-performance purposes, this information may lead to the discovery of admissible evidence of Public Service's belief or acknowledgement as contained in any response to the NRC. Information is "relevant" under Rule 26(b)(1) if it "appears reasonably calculated to lead to the discovery of admissible evidence."

As the NRC later criticized Public Service's "management involvement in establishing a safety perspective, and requiring attention to detail, and in ensuring procedural adherence"[7] with respect to the first (1983) shutdown, this interrogatory is tailored to two important issues—both mismanagement acknowledgement (if any) and course of conduct in meeting a generator's duty to keep co-owners informed of significant events (here, NRC management criticism, if any) prior to the 1983 shutdown.

---

6. The party objecting to an interrogatory on the grounds of overbreadth or undue burden must show "specifically how ... each interrogatory ... is overly broad, burdensome or oppressive." *Josephs v. Harris Corp.*, 677 F.2d 985, 992 (3d Cir.1982) *(quoting Roesberg v. Johns–Manville Corp.*, 85 F.R.D. 292, 296–97 (E.D.Pa.1980)).

7. NRC letter to Public Service, dated May 5, 1983, reproduced at Tab 7 of PECo's Brief, discussed above.

Accordingly, the motion is *granted* with respect to *No. 135* (Public Service).

### 7. Interrogatory No. 144 (Public Service)

PECo seeks in No. 144 identification of all documents or oral communications relating to Public Service's interviews with the press and press conferences concerning the three Salem outages. Information disseminated by Public Service to the press may contain analysis of the cause(s) of the shutdowns, and any public acknowledgement of management deficiency may lead to discovery of information concerning Public Service's interpretation of a generator's duties and cost sharing under the Agreement.

The motion is *granted* as to *No. 144* (Public Service).

### 8. Interrogatory Nos. 85, 88, 91, and 96 (Atlantic/Delmarva)

These interrogatories ask Atlantic and Delmarva to identify any evaluation, assessment or analysis they performed of Public Service's liability for the Salem shutdowns [Nos. 85, 88, 91], or which was received from any other source [No. 96]. These are objected to on relevance grounds.

If limited to the time preceding the Peach Bottom 1987 shutdown, such analyses or evaluations of Public Service's liability under the Salem Owners Agreement could lead to evidence of Atlantic and Delmarva's prior interpretations, if any, of a generator's duties to co-owners in outage situations. If such analyses were shared with persons outside the company, they could be evidence of an articulated view of the generator's duties under the Agreements. Similarly, analyses of Public Service's liability for the outages received from others may lead to discovery of follow-up information concerning Atlantic and Delmarva's ratification, if any, of such views. If the analyses draw a conclusion of Public Service's mismanagement or gross negligence and Atlantic/Delmarva nonetheless decided such misconduct was not actionable under the Agreements, it may be evidential of the parties' course of performance prior to the Peach Bottom outages.

The motion is *granted*, but confined to information created prior to March 1987, as to *Nos. 85, 88, 91 and 96* (Atlantic/Delmarva).

### 9. Interrogatory No. 97 (Atlantic/Delmarva)

PECo asks Atlantic and Delmarva to identify and explain any discussion, analysis or assessment engaged in by the co-owners concerning the possibility of or the prospects for asserting a claim or demand against Public Service for damages or losses incurred as a result of the Salem outages. Again, if limited to the time preceding the 1987 Peach Bottom shutdown, such discussions could reflect the parties' mutual interpretation of rights against operators under the Agreements.

The motion (as limited in time) is *granted* as to *No. 97* (Atlantic/Delmarva).

### 10. Interrogatory Nos. 98, 99 and 100 (Atlantic/Delmarva)

PECo seeks to learn whether Atlantic or Delmarva ever asserted claims against Public Service or demanded payment or remuneration as a result of the three Salem outages. This is relevant to course of performance and therefore discoverable here. The motion is *granted* as to *Nos. 98, 99 and 100* (Atlantic/Delmarva).

### 11. Interrogatory Nos. 109 and 119 (Atlantic/Delmarva) and 132 (Public Service)

These interrogatories seek information from Atlantic/Delmarva (No. 119) and from Public Service (No. 132) concerning directors' meetings at which any of the three Salem outages were discussed. To the extent the interrogatory seeks information about any conversation between two or more directors, it is overbroad and unanswerable. To the extent the respective boards of directors considered whether Public Service is liable to the co-owners for mismanagement or gross negligence, the minutes of such meetings would shed light

upon plaintiffs' interpretation of the operator's liability to co-owners. The court holds that, as herein limited, the portions of such minutes of directors' meetings expressing a view of the liability of Public Service to co-owners under the Agreement are relevant and discoverable for present purposes.

Similarly, Atlantic and Delmarva have been asked (No. 109) to identify all reports to their shareholders regarding any of the three Salem outages. Plaintiffs' corporate statements to shareholders concerning the Salem outages may be productive of evidence of Atlantic and Delmarva's interpretation of an operator's duties under the Agreement, and such statements are discoverable.

The motion is *granted* (as limited above) as to *No. 119* (Atlantic/Delmarva) and *No. 132* (Public Service), and *granted* as to *No. 109* (Atlantic/Delmarva).

12. Interrogatory Nos. 84, 87, 90, 93–95 (Atlantic/Delmarva), and Nos. 99–101 (Public Service)

These interrogatories generally concern assessments and analyses of restart problems at the Salem plant following each of the three outages. PECo argues that this requested information is relevant to evaluating the validity of plaintiffs' criticisms of PECo's restart efforts following the 1987 Peach Bottom shutdown. PECo also seeks evidence of co-owner acquiescence in Public Service's delays in efforts to restart Salem, as a counterpoint to plaintiffs' claims concerning PECo's restart efforts at Peach Bottom.

This court agrees with the plaintiffs' arguments that analyses of Salem restart problems are not reasonably calculated to shed light upon the parties' view of the Owners Agreement. First, the start-up delays at Salem were of a different kind than Peach Bottom; from all available information before the court it appears that the long Peach Bottom delay was allegedly caused by an absence of management during the early part of the post-March 1987 shutdown, and then by the NRC's lack of satisfaction with PECo's re-training and supervisory efforts and expressions of lack of confidence in the PECo organization, as documented, for example, in the materials cited in the statement of facts in the Memorandum of Plaintiffs Atlantic and Delmarva in Opposition to Motion to Dismiss (filed January 25, 1989), at 4–8.[8] The present complaints allege that PECo committed acts of mismanagement, gross negligence and fraud with respect to the Peach Bottom shutdowns and delayed startup. No similar allegation has been brought to the court's attention concerning Public Service's responsibility for the (relatively brief) start-up delays at Salem, so that the discovery sought here by PECo concerning the Salem delays would appear to be unlikely to lead to relevant evidence of the parties' contractual interpretations.

In the absence of some proffer by PECo that there was a substantially identical course of performance among the parties relating to Salem delays attributable to mismanagement rather than product failure, these interrogatories would, at most, be relevant only to the counterclaim issues, on which discovery has been stayed.

Therefore, the motion is *denied* as to *Nos. 84, 87, 90, 93–95* (Atlantic/Delmarva) and *Nos. 99–101* (Public Service).

13. Interrogatory Nos. 107–108 (Atlantic/Delmarva), and Nos. 112–114 (Public Service)

These five interrogatories seek to explore the plaintiffs' assessments and analyses of each unscheduled or forced outage at Salem, beyond the three major outages otherwise referred to throughout this motion. Although PECo has cast a somewhat smaller net for information about the non-

---

**8.** *See, e.g.,* NRC's August 9, 1988 Notice of Violation and Synopsis; Institute of Nuclear Power Operator's investigative report dated January 11, 1988 [Exhibit B to Public Service Complaint]; PECo President Joseph F. Paquette, Jr.'s "Open Letter to the Peach Bottom Community," dated March 31, 1988 [Tab 2 of Brief of Atlantic/Delmarva in Opposition to present motion]; Executive Summary of Report, "Problem Root Cause Assessment of Peach Bottom Shutdown," dated June 17, 1987 [Tab 3 of Brief of Atlantic/Delmarva].

major outages, it is nonetheless fishing and has not demonstrated why such discovery of relatively minor events and de minimis regulatory actions over the years of operation of Salem is relevant to present issues.

Therefore, the motion is *denied* as to *Nos. 107–108* (Atlantic/Delmarva) and *Nos. 112–114* (Public Service).

## 14. Interrogatory Nos. 80, 82 and 105 (Atlantic/Delmarva), and No. 108 (Public Service)

PECo seeks (in Nos. 80, 82 and 105) to learn whether Atlantic and Delmarva have received information concerning Salem generated by the Institute for Nuclear Power Operations ("INPO"), a nuclear industry group which periodically inspects both Peach Bottom and Salem. Also, in No. 108, PECo requests all documents which INPO gave to Public Service regarding Salem. PECo seeks INPO-related information about Salem in order to assess the parties' course of performance regarding operator's dissemination of INPO analyses to the co-owners.

Information about the practices followed among the co-ownership regarding distribution of INPO information is relevant to the plaintiffs' allegations that PECo breached its duty to keep the co-owners advised of significant INPO criticisms of the operator. Logically, if Public Service received significant criticism from INPO about its management of Salem and did not recognize a duty to share the INPO critique with Salem's co-owners, Public Service's course of conduct, and any acquiescence by co-owners in the non-disclosure, could be admissible evidence of the parties' interpretation of the operator's duty to share such information.

For these reasons, the INPO documents are relevant, but the time period will be compressed to the years 1980 through the time of the Peach Bottom shutdown in March 1987, to encompass the years of the three major Salem outages and several pri-

or years, including the years in which PECo was alleged to have breached this duty to its co-owners. As *limited* herein in time, the motion is *granted* as to *Nos. 80, 82 and 105* (Atlantic/Delmarva) and *No. 108* (Public Service).

## 15. Interrogatory Nos. 101, 102–104, 106 and 117 (Atlantic/Delmarva), and 107, 109 and 110 (Public Service)

PECo seeks to elicit information in these interrogatories about whether Atlantic/Delmarva ever expressed concern to Public Service about the quality and efficiency of Public Service's Salem operation (No. 101), or requested information from the NRC about Salem (No. 102), or expressed concern to the NRC or to INPO about Public Service's operation of Salem (Nos. 103 and 104), or received from sources other than co-owners, NRC and INPO any information about quality or efficiency of Salem (No. 106). Atlantic and Delmarva are next asked to identify all persons responsible for monitoring and assessing Salem on their behalves (No. 117).

Similarly, Public Service is requested to disclose whether any co-owner ever expressed concerns for Salem's efficiency or for the status of operations at Salem (No. 107), and whether Public Service ever had a meeting or conversation about Salem at which PECo was not present or did not participate (No. 110). Also, PECo seeks to learn whether Public Service has ever received any documents created by Atlantic or Delmarva concerning the three Salem shutdowns or the penalties (No. 109).[9]

All of these concerns relate to the counterclaims, which have been stayed, and no relevance is seen to pending issues. PECo's argument that such information "is critical to put in proper context plaintiffs' allegations of breach" (PECo's Brief at 26) is unsupported by any sort of proffer that such concerns were actually raised at Salem by co-owners or, for that matter, by PECo itself.

**9.** PECo's Interrogatory No. 109 to Public Service was listed in PECo's Brief at 18 among the categories of interrogatories as discussed in the Opinion in subparts II.C (1–7), above, but it was not briefed there. The discussion of No. 109 (Public Service) is included here because it logically relates to Nos. 107 and 110, discussed herein.

For these reasons, the motion is *denied* with respect to *Nos. 101, 102–104, 106 and 117* (Atlantic/Delmarva), and *107, 109 and 110* (Public Service).

### 16. Interrogatory Nos. 138, 139 and 142 (Public Service)

PECo seeks all Suspected Licensee Event Reports and all Licensee Event Reports, and all Upset Reports for Salem (Nos. 138 and 139). PECo also asks Public Service whether during the year prior to each of the major Salem outages, Public Service assigned sufficient trained personnel to operate the Station in a reliable and economic manner. (No. 142.)

PECo's reason for obtaining this information—"to determine whether similar situations may have preceded the forced outages at Salem upon which PECo bases its counterclaims," PECo Brief at 28—is mooted by the Order staying counterclaim discovery. That Public Service may have served identical interrogatories upon PECo with respect to Peach Bottom is of no moment here; these interrogatories concern issues of operational problems implicated in the parties' affirmative claims, but would shed no light on Public Service's interpretation of an operator's duties under the Agreement.

The motion is *denied* with respect to *Nos. 138, 139 and 142* (Public Service).

### 17. Interrogatory No. 83 (Public Service)

PECo also seeks to learn whether Public Service has received from any shareholders a demand, request or suggestion that litigation be initiated against PECo concerning the 1987 Peach Bottom shutdown. This information, of course, is not sought for course of performance purposes, but is a rather unobjectionable inquiry perhaps touching upon plaintiff Public Service's reasons for filing this lawsuit. No privilege is asserted for shareholder communications, and the inquiry is of sufficient relevance upon issues raised by the Complaint.

The motion will be *granted* with respect to *No. 83* (Public Service).

### D. *Summary*

For the foregoing reasons, the motion by defendant PECo to compel responsive answers to interrogatories will be granted in part and denied in part. The accompanying Order will be entered, and plaintiffs Atlantic/Delmarva and Public Service will be compelled to certify and serve more responsive answers to those items which have been granted, *within thirty (30) days.*

The following chart summarizes these dispositions, for the parties' ease of reference, and it identifies the section of Part II.C, above, in which the cited Interrogatory has been discussed:

Interrogatories to Atlantic/Delmarva

| Interrogatory | Disposition | Subpart II.C |
|---|---|---|
| 80 | Granted (limited) | 14 |
| 82 | Granted (limited) | 14 |
| 83 | Granted (limited) | 1 |
| 84 | Denied | 12 |
| 85 | Granted (limited) | 8 |
| 86 | Granted (limited) | 1 |
| 87 | Denied | 12 |
| 88 | Granted (limited) | 8 |
| 89 | Granted (limited) | 1 |
| 90 | Denied | 12 |
| 91 | Granted (limited) | 8 |
| 92 | Granted (limited) | 1 |
| 93 | Denied | 12 |
| 94 | Denied | 12 |
| 95 | Denied | 12 |
| 96 | Granted (limited) | 9 |
| 98 | Granted (limited) | 10 |
| 99 | Granted | 10 |
| 100 | Granted | 10 |
| 101 | Denied | 15 |

## Interrogatories to Atlantic/Delmarva

| Interrogatory | Disposition | Subpart II.C |
|---|---|---|
| 102 | Denied | 15 |
| 103 | Denied | 15 |
| 104 | Denied | 15 |
| 105 | Granted (limited) | 14 |
| 106 | Denied | 15 |
| 107 | Denied | 13 |
| 108 | Denied | 13 |
| 109 | Granted | 11 |
| 110 | Denied | 2 |
| 111 | Denied | 2 |
| 112 | Denied | 3 |
| 113 | Granted | 3 |
| 114 | Granted | 3 |
| 115 | Granted | 3 |
| 117 | Denied | 15 |
| 119 | Granted (limited) | 11 |

## Interrogatories to Public Service

| Interrogatory | Disposition | Subpart II.C |
|---|---|---|
| 83 | Granted | 17 |
| 92 | Granted (limited) | 1 |
| 94 | Granted (limited) | 1 |
| 96 | Granted (limited) | 1 |
| 98 | Granted (limited) | 1 |
| 99 | Denied | 12 |
| 100 | Denied | 12 |
| 101 | Denied | 12 |
| 107 | Denied | 15 |
| 108 | Granted (limited) | 14 |
| 109 | Denied | 15 |
| 110 | Denied | 15 |
| 112 | Denied | 13 |
| 113 | Denied | 13 |
| 114 | Denied | 13 |
| 116 | Denied | 2 |
| 117 | Denied | 2 |
| 118 | Denied | 2 |
| 119 | Denied | 4 |
| 120 | Denied | 4 |
| 121 | Denied | 4 |
| 122 | Denied | 4 |
| 123 | Denied | 4 |
| 124 | Denied | 4 |
| 128 | Denied | 4 |
| 129 | Denied | 4 |
| 130 | Denied | 4 |
| 131 | Denied | 5 |
| 132 | Granted (limited) | 11 |
| 134 | Denied | 4 |
| 135 | Granted | 6 |
| 138 | Denied | 16 |
| 139 | Denied | 16 |
| 142 | Denied | 16 |
| 144 | Granted | 7 |