In re U.S. PHYSICIANS, INC., (Jointly Administered with U.S. Medical Services of Pennsylvania, P.C., U.S. Medical Services of New Jersey, P.C., U.S. Medical Services of Delaware, P.A., and U.S. Rehabilitation Services of Pennsylvania, P.C.), Debtors.

Bankruptcy Nos. 98–34011DAS, 98–34012DAS, 98–34014DAS, 98–34023DAS.

United States Bankruptcy Court, E.D. Pennsylvania.

June 30, 1999.

Gary M. Schildhorn, Adelman, Lavine, Gold and Levin, Philadelphia, PA, for debtors.

Daniel M. Grauman, Bala Cynwyd, PA, trustee in U.S. Physicians Case.

Christine C. Shubert, Tabernacle, NJ, trustee in other cases.

Aris J. Karalis, Ciardi, Maschmeyer & Karalis, P.C., Philadelphia, PA, for trustee Christine C. Shubert.

Morton Branzburg, Klehr, Harrison, Harvey, Branzburg & Ellers, Philadelphia, PA, for trustee Daniel M. Grauman.

Henry DeWerth–Jaffe, Pepper Hamilton & Scheetz, Philadelphia, PA, for HCFP Funding Inc.

Walter Weir, Jr., Philadelphia, PA, for Doctors and B & J.

Frederic Baker, Ass't. U.S. Trustee, Philadelphia, PA, United States Trustee.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION

Presently before us is the joint motion ("the Motion") of HCFP Funding, Inc. ("HCFP") and the Chapter 7 Trustee of certain of the affiliated Debtors, Christine Shubert, Esquire ("the Trustee;" with HCFP, "the Movants"), seeking authority to distribute monies pursuant to a Final Cash Collateral Order ("the Order") entered by this Court on January 15, 1999. The Movants further seek compensatory and punitive damages against Donald B. Smith, M.D. and William D. Fritz, M.D. ("the Doctors") due to the Doctors' alleged conversion and/or violations of the automatic stay pursuant to 11 U.S.C. § 362(a)(3) in light of their failure to turn over certain pre-petition accounts receivable ("the Receivables") collected by the Doctors that arose from services rendered while the Doctors were employed by Debtor U.S. Medical Services of Pennsylvania, P.C. ("PA PC"), one of several entities being jointly administered with the Chapter 7 bankruptcy case of Debtor U.S. Physicians, Inc. ("USP").

We grant the Motion for the most part, thereby authorizing the Trustee to release to HCFP the Receivables collected from and relating to the Doctors and their wholly-owned professional corporation, Bone & Joint Specialists of Western Pennsylvania, P.C. ("B & J"), which have been deposited by the Trustee in a separate escrow account pursuant to the terms of the Order. We also conclude that the Movants are entitled to $65,000 in compensatory damages for attorneys' fees and interest costs resulting from the Doctors' conversion of the Receivables due to their retaining a substantial portion of this estate property

until confronted with the Motion. However, we find that the Doctors did not necessarily violate the automatic stay nor are they liable for punitive damages.

## B. PROCEDURAL AND FACTUAL HISTORY

On or about January 28, 1997, the Doctors entered into an Asset Purchase Agreement ("the APA") pursuant to which the Doctors sold substantially all of the assets of B & J to USP, including the outstanding accounts receivable that they or B & J had generated. This transaction occurred in furtherance of USP's plan to form a large physician practice management company which would acquire numerous physician practice groups by purchasing essentially all of their assets and then employing the physicians through affiliated professional corporations. This concept was believed to be beneficial to the member physicians because it offered them an opportunity to increase the liquidity of their practices. The operations of this large affiliated organization and a portion of the purchase prices for the various practices were to be funded by USP's contemplated initial public stock offering ("the IPO").

In accordance with the APA, the Doctors entered into five-year employment agreements with PA PC, thereby becoming its employees. Under these agreements, the Doctors were no longer responsible for any of the expenses associated with the B & J practice, and all of its employees were paid by PA PC, including the Doctors. In return, the Doctors were contractually obligated to turn over to PA PC any and all fees paid or assigned to the Doctors for all professional services which they performed during the term of their respective agreements.

To facilitate this arrangement, PA PC established a bank account in which all receivables collected by the Doctors were to be deposited. B & J accordingly regularly deposited all collected receivables into the PA PC account until October 22, 1998, when the Debtors fell behind in their payments to B & J's vendors. We note that many of the acquisitions made by USP were contingent upon the consummation of the IPO, which was delayed and finally was deemed unlikely to occur at all. Once it became clear that the IPO was not going to materialize, it became obvious that USP's general concept had failed and it would be necessary to unravel USP's acquisitions of the pertinent physician practices. As a means of effecting this process, USP, PA PC, and several other affiliated entities filed voluntary Chapter 11 bankruptcy petitions on October 30, 1998. Perhaps not coincidentally, on that same day, B & J began depositing a portion of their collected receivables in a dormant B & J account over which the Doctors had exclusive control rather than into the PA PC account used previously.

The Doctors testified that they diverted the funds to their own account because of their growing concern about PA PC's seeming inability to stay current with its payroll obligations to B & J or its obligations to B & J's vendors. B & J used some of these funds to pay past due utility bills and to make payroll advances to B & J's support staff and to the Doctors themselves. Since the Doctors were at that time also in the process of separating their practices, they decided to use a portion of the diverted funds as a convenient source of start-up capital to help facilitate the establishment of their respective new offices.

On November 9, 1998, the Debtors' five above-captioned cases were all converted to Chapter 7 cases when HCFP balked at providing funding sufficient to keep the Debtors' operations afloat without protections to which other interested parties, mostly various former or present affiliated physicians, refused to agree. The Trustee was appointed as interim trustee of all five Debtors on November 10, 1998. Daniel Grauman ("the USP Trustee") was elected as the permanent Chapter 7 trustee in the USP case on April 12, 1999. The Trustee

thereafter served as permanent trustee for only the affiliated Debtors, including PA PC.

The Doctors received formal notice of PA PC's bankruptcy filing on or about November 13, 1998, by means of what was apparently a form letter sent by the Trustee to all of USP's affiliated physicians. This letter explained the concept of the automatic stay and informed the recipients that they were required to immediately turn over all estate property, including any collected pre-petition receivables, to the Trustee.

On December 18, 1998, we entered an interim Order authorizing the use of cash collateral pursuant to a Stipulation between HCFP and the Trustee. At the final hearing of January 8, 1999, to approve the Stipulation, the Doctors and B & J, *inter alia*, filed a response and a limited objection to the relief sought. This Court, after considering the various objections, entered the Order of January 15, 1999, in a slightly-revised form.

The Order as entered permitted the Trustee to use a portion of HCFP's cash collateral to effectively administer the Debtors' estates. It also gave all interested parties until March 1, 1999, to challenge HCFP's claim to a valid first priority lien against all of the Debtors' assets. Additionally, the Order contained specific carve-out language which limited the Trustee's right to distribute certain assets relating to some of the affiliated practices, including B & J. In return, the practices were to turn over all pre-petition accounts receivable collected and to provide an accounting of same to the Trustee.

By the end of January 1999, the Doctors had remitted a partial total payment of $219,127.29 of the Receivables to the Trustee. In late March 1999, the Doctors made payments of Receivables totaling $96,220.72 to the Trustee, and an additional $150,000 was remitted on April 21, 1999. On May 13, 1999, $48,490.26 was sent. Finally, the last payment of the Receivables refund of $41,416.46 was made to the Trustee on June 1, 1999. In all, the Doctors returned $555,254.73 to PA PC's bankruptcy estate. There is no allegation that additional sums are due, but the Movants do allege that the remittances were delayed, in part because the Doctors used certain of the funds for their own purposes.

In accordance with their right to file objections to HCFP's receipt of all of the Receivables by March 1, 1999, under the terms of the Order, the Doctors, on February 16, 1999, filed a motion seeking to set off certain of the Receivables against unpaid wages which they claimed were owed to them under their employment agreements ("the Setoff Motion"). They also filed an adversary proceeding, at Adversary No. 99–0139 ("the Proceeding"), as several other physician groups have done in similar other proceedings, most of which were settled on June 22, 1999, seeking to establish the validity, priority and extent of their own alleged liens vis-á-vis that of HCFP in relation to the assets sold by them to USP under the APA.

The hearing on the Setoff Motion, originally scheduled for March 16, 1999, was rescheduled with the consent of all parties until April 15, 1999, the same date as the initial trial date of the Proceeding. However, a few days before April 15, the Doctors retained new counsel, and at their new counsel's uncontested request, the matters were continued again until April 29, 1999. On the latter date, the Doctors withdrew the Setoff Motion.

The instant Motion was filed by HCFP and the Trustee on May 11, 1999, and we granted their application for its expedited hearing, by agreement of the parties, on May 20, 1999. The hearing in fact was conducted by this Court on May 20, May 24, and May 26, 1999, and included the testimony of several witnesses. The trial of the Proceeding was continued until June 22, 1999, although it was reported that it would be withdrawn on that date.

At the hearing the Doctors both testified that they understood little of bankruptcy law or of the employment agreements that they had signed and, as a result, had depended heavily on their counsel to handle their involvement with these bankruptcy proceedings and the legal effect of their agreements with USP and PA PC. They further testified that they were unclear as to who owned the Receivables generated by B & J, despite the clear language of their respective employment agreements and the Trustee's letter of November 13, 1998, indicating her ownership of same.

The considerable length of the hearing was due in substantial part to the Doctors' asserting that PA PC was not properly formulated and hence that its very bankruptcy filing was defective due to an earlier failed transaction between USP and another unrelated organization also represented by the Doctors' new counsel, Orthopedic Surgery and Sports Medicine, P.C. ("OSSM"). In the latter stages of the hearing, the Doctors abandoned that position as untenable.

On May 26, 1999, this Court entered an order setting the post-hearing briefing schedule as follows: the Movants' opening brief was due by June 4, 1999; the Doctors' responsive brief by June 14, 1999; and the Movants had the opportunity to file a final reply brief by June 17, 1999. The Movants' opening brief, supported by a short submission by the USP Trustee, echoed the position they had advanced during the hearing, *i.e.*, that the employment agreements clearly established that the Receivables generated by the former B & J practice were the property of PA PC's estate and that the Doctors' wrongful retention of the Receivables constituted conversion and a violation of the automatic stay under § 362(a)(3), rendering the Doctors liable for compensatory and punitive damages as a result, *inter alia*, of their "willful" violation of the stay under 11 U.S.C. § 362(h).

The Doctors' brief not only did not address their previously-abandoned issue of PA PC's formulation, but also it failed to respond in any meaningful sense to the arguments presented by the Movants regarding their right to the Receivables, hence apparently conceding that the Receivables were, for the most part, indeed the property of the PA PC bankruptcy estate. They did contend, however, that the express language of the signed employment agreements had been modified by the parties' course of conduct and thus PA PC had consequently waived its right to strictly enforce the recovery of the Receivables as provided under the agreements. In addition, in their brief they requested that certain funds representing overpayments by third party payers to B & J, alleged to be approximately $32,000, be placed in a constructive trust because the funds were not the rightful property of the Movants. Finally, the Doctors argued for the first time that, under 11 U.S.C. § 506(c), they were entitled to a collection fee of five (5%) percent of the approximately $556,000 collected, or approximately $27,812, for their efforts in collecting the Receivables because of the direct benefit conferred thereby on HCFP. The Movants' reply brief contested the arguments made in the Doctors' brief and reasserted their claim for damages resulting from the Doctors' retention of Receivables for a considerable period.

## C. DISCUSSION

1. *The Pre–Petition Accounts Receivable Collected by B & J Are the Rightful Property of PA PC's Estate and May Be Properly Applied to HCFP's Account Pursuant to the Order.*

Under paragraph 6(b) of the rider to their respective employment agreements, the Doctors agreed to turn over to PA PC "any and all fees paid or assigned to Physician for all professional services ... which Physician performs during the term of this Agreement." Despite this clear evidence on this subject, both doctors Smith and Fritz testified that they were

unclear as to who actually owned the Receivables which they generated under the name of B & J.

The law is, however, clear concerning what constitutes property of the estate. In *United States v. Whiting Pools*, 462 U.S. 198, 204–05, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983), the Court interpreted 11 U.S.C. § 541(a), the Code section that defines what constitutes property of the estate, as follows:

> § 541(a)(1) provides that the "estate is comprised of all the following property, wherever located: ... all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1) (1976 ed., Supp V). The House and Senate Reports on the Bankruptcy Code indicate that § 541(a)(1)'s scope is broad. (footnotes omitted).

Even if § 541(a)(1) were not so broadly interpreted, the Receivables at issue are unquestionably the property of PA PC's bankruptcy estate under the terms of the agreements. *Accord, In re Express America, Inc.*, 132 B.R. 535, 539 (Bankr.W.D.Pa. 1991); *In re L.P. Maun, M.D., Ltd.*, 92 B.R. 790, 797 (Bankr.S.D.Ill.1988), *aff'd*, 105 B.R. 464 (S.D.Ill.1989); and *In re AM Int'l, Inc.*, 46 B.R. 566, 577 (Bankr. M.D.Tenn.1985). The language of the APA and the employment agreements clearly establish that the B & J practice was no longer an independent entity after January 1997; rather, it was owned thereafter by USP/PA PC. The Doctors were only allowed to continue practicing under the name "B & J" because that name had value in Franklin, Pennsylvania, the small, rather isolated community in which they practiced.

While apparently abandoning their right to retain the Receivables, the Doctors apparently attempted to justify their previous retention of them by arguing that the express terms of the employment agreements were not controlling. Specifically, the Doctors allege that PA PC failed to implement a billing and collections system for B & J as required by the agreements, choosing instead to leave those activities in the hands of B & J. As a result, the Doctors argue, the agreements were no longer binding and they are entitled to a portion of the Receivables collected for their collection activities. They further assert that whatever rights of enforcement the Trustee might have once possessed under the agreements have been waived due to the Trustee's failure to pursue the matter in a timely fashion.

 The main issue, then, is one of contract interpretation. The Doctors cite several cases for the principle that a contract should be interpreted according to the course of performance between the parties, *e.g., Kelley v. Penn Mart Supermarkets, Inc.*, 1994 WL 276270 (E.D.Pa. 1994); *Public Service Enterprise Group, Inc. v. Philadelphia Electric Co.*, 130 F.R.D. 543 (D.N.J.1990); and *Atlantic Richfield Co. v. Razumic*, 480 Pa. 366, 390 A.2d 736 (1978). However, this principle applies only if there is some degree of ambiguity regarding the meaning of the contract terms regarding which the course of performance is at issue. As we held in *In re St. Mary Hospital*, 101 B.R. 451, 461 (Bankr.E.D.Pa.1989),

> an unambiguous contract provision must be interpreted as it is written, not as the parties may have meant it or interpreted it. *See, e.g., Philadelphia, W & B R v. Trimble*, 77 U.S. (10 Wall.) 367, 377, 19 L.Ed. 948 (1870); *In re Penn Central Transportation Co.*, 831 F.2d 1221, 1225–28 (3d Cir.1987); *Mellon Bank, N.A. v. Aetna Business Credit, Inc.*, 619 F.2d 1001, 1009–14 (3d Cir.1980); *In re Temp–Way Corp.*, 82 B.R. 747, 751 (Bankr.E.D.Pa.1988); 1 [A. CORBIN, CORBIN ON CONTRACTS,] § 104, at 464 (1963); and 4 [S. WILLISTON, A TREATISE ON THE LAW OF CONTRACTS,] § 610, at 499–500 (3d ed. Jaeger 1961).

*See also, e.g., In re St. Mary Hospital*, 117 B.R. 125, 131–32 (Bankr.E.D.Pa.1990).

As we previously indicated, we find the language of the employment agreements

was clear and unambiguous. As employees of PA PC, the Doctors were obligated to remit any and all receivables collected to PA PC. In fact, the Doctors' own conduct, let alone that of PA PC or the Trustee, does not indicate a contrary interpretation on their part. Prior to October 22, 1998, the Doctors followed a regular procedure and deposited all of the Receivables collected into the PA PC account without question.

■ Even if we were inclined to believe that PA PC had failed to "arrange" for the collection of B & J's Receivables, which we are not, such a failure would provide no basis for granting B & J an ownership interest in the Receivables. Moreover, we note that the Trustee put the Doctors on notice, by her letter of November 13, 1998, that she was asserting her rights to the Receivables. Her delay until May 1999, only a period of a few months in the course of her administration of a complex case, to press those rights does not, in our view, come close to constituting a voluntarily, intelligent, known waiver of those rights. *See In re Morningstar Enterprises, Inc.,* 128 B.R. 102, 104–05 (Bankr.E.D.Pa.1991) (distinguishing the result on the applicable law referenced in *In re Car–Gill, Inc.,* 125 B.R. 133, 137 (Bankr.E.D.Pa.1991)). At best, this delay may serve as a mitigating factor in the calculation of damages.

We therefore find any remaining embers of the Doctors' argument that they possessed some ownership interest in the Receivables, lacking in merit as well as fire, and we therefore hold that the Receivables are property of PA PC's bankruptcy estate which that entity can distribute to HCFP in accordance with the terms of the Order.

2. *The Doctors' Use and Retention of the Receivables for a Considerate Period, While Not a Violation of the Automatic Stay, Does Give Rise to Damages for Conversion, Which We Measure at $65,000.*

■ The Movants vigorously assert that the Doctors' retention of the Receivables constituted a violation of the automatic stay under § 362(a)(3). Indeed, that Code section prohibits "any act to obtain possession of property of the estate or of property from the estate or to *exercise control over property of the estate*" (emphasis added). We have already established that the Receivables at issue are and were the property of the estate. The question then becomes whether the Debtors' acts constituted attempts to exercise control over property of the estate in violation of the stay under § 362(a)(3).

■ In attempting to interpret the language of § 362(a)(3), we are aided by *In re Young,* 193 B.R. 620, 624–25 (Bankr. D.D.C.1996), which provides the following analysis:

> In addressing the question of possession, the Code expressly restricts only obtaining possession of the property, rather than the passive act of simply continuing to possess it. In contrast to the act of passively retaining possession, the prohibited act of exercising control implies a more affirmative act by the creditor. As the Webster's definition indicates, the word exercise connotes the positive acts of bringing into play, making effective in action, bringing to bear, exerting. One commentator has commented that had Congress intended the amendment to § 362(a)(3) to require immediate turnover, "more passive language such as 'retain control' would be found in the revision to Section 362(a)(3) of the Code." *See* John C. Chobot, *Some Bankruptcy Stay Metes and Bounds,* 99 Com.L.J. 301, 309 (1994). By the same logic, if Congress intended to prohibit creditors from holding property seized pre-petition, it also could have barred an act to "retain possession." Read in this context, the prohibition against an act to exercise control does not reach the passive act of continuing to possess property.

*See also In re Richardson,* 135 B.R. 256, 259 (Bankr.E.D.Tex.1992) (any exercise of

control, to be sanctionable, must occur post-petition and must involve an affirmative act on the part of the creditor).

Under this interpretation of the language of § 362(a)(3), the Doctors' actions in merely retaining control over the Receivables after learning of the bankruptcy filings would not appear to constitute a stay violation. We find this interpretation of the language of § 362(a)(3) compelling, *see In re Najafi*, 154 B.R. 185, 194–95 (Bankr.E.D.Pa.1993) (agreeing with the reasoning of *Richardson, supra* ), although we recognize that other courts have reached a different conclusion. *See In re Del Mission Ltd.*, 98 F.3d 1147, 1151 (9th Cir.1996); *In re Knaus*, 889 F.2d 773, 775 (8th Cir.1989); and *In re Sharon*, 234 B.R. 676 (6th Cir. BAP 1999).

The Doctors have clearly violated their employment agreements by not promptly returning to the Trustee the pre-petition Receivables they generated as employees of PA PC. As we have stated in prior decisions, however, we are not quick to characterize actions such as those taken by the Doctors in this case as stay violations, but rather as violations of the underlying contract, in this case of the two employment agreements. *See In re Pocono Springs Co.*, 1997 WL 347906, at *6 (Bankr.E.D.Pa. June 18, 1997); *In re Orsa Associates*, 99 B.R. 609, 622–23 (Bankr. E.D.Pa.1989) (refusing to undo a wrongful pre-petition action is not a stay violation); and *In re TM Carlton House Partners, Ltd.*, 93 B.R. 859, 870 (Bankr.E.D.Pa.1988) (a post petition contractual violation is not a stay violation). We see no reason to deviate from this line of decisions. We therefore hold that the Doctors' actions, while violative of their employment agreements, fail to constitute stay violations. Thus, we hold that the Movants cannot recover damages under § 362(h) for a willful stay violation against the Doctors.

■ However, this conclusion ultimately makes little difference in the result, because the Movants clearly *can* recover damages for the Doctors' conversion of PA

PC's Receivables. "Conversion is the deprivation of another's right of property in, or use or possession of, a chattel, without the owner's consent and without lawful justification." *Francis J. Bernhardt III, P.C. v. Needleman*, 705 A.2d 875, 878 · (1997). *Accord, In re Windsor Communications Group, Inc.*, 80 B.R. 712, 724 (Bankr.E.D.Pa.1987), *aff'd in part & rev'd in part on other grounds*, 96 B.R. 495 (E.D.Pa.1989). "Money may be the subject of conversion." *Needleman, supra*, 705 A.2d at 878. It is clear that the Doctors retained property of the bankruptcy estate of PA PC without lawful justification therefor. Both Doctors were obligated under their respective employment agreements to remit any and all fees generated as employees of PA PC to it without exception. This they failed to do. Thus, while the Doctors may have believed that their actions were justified, considering USP's inability to pay any salaries or to make any payments to B & J's vendors by late October 1998, the Doctors are nonetheless liable for the resultant injury incurred by the Movants in having to make considerable efforts to recover the converted Receivables. *See Plack v. Baumer*, 121 F.2d 676, 678–79 (3d Cir.1941) (totally innocent actions of a party may nevertheless constitute actionable conversion). We find that, while the actions of the Doctors were not egregious, and their willingness to abandon arguments which they ultimately deemed lacking in merit was refreshing in its candor, and ultimately a factor in mitigating damages, neither were they totally innocent. Furthermore, they put the Movants to the considerable time and expense of trying issues in court that even the Doctors themselves could not ultimately support. Thus, substantial damages are in order.

■ In determining the amount of damages due in a conversion case, the court's task is to compensate the plaintiff for the defendant's wrong, conforming the remedy to the particular facts of the case.

*See Fort Washington Resources, Inc. v. Tannen,* 901 F.Supp. 932, 944 (E.D.Pa. 1995). The amount awarded often comports to the value of the converted property at the time of the conversion. *See id.* However, in *Lynch v. Bridges & Co., Inc.,* 451 Pa.Super. 92, 96, 678 A.2d 414, 416 (1996), quoting *Delahanty v. First Pennsylvania Bank,* 318 Pa.Super. 90, 118, 464 A.2d 1243, 1257 (1983) (citations omitted), the court noted that

> "[t]he fact-finder may make a just and reasonable estimate of the damage based on relevant data, and in such circumstances may act on probable and inferential, as well as upon direct and positive, proof. Thus, the law does not demand that the estimation of damages be completely free of all elements of speculation."

The Doctors, as of June 1, 1999, had restored all of the Receivables to the Trustee. However, the Movants have incurred a substantial amount of attorneys' fees and costs in bringing about the Doctors' compliance and have asked this court to award them compensatory and punitive damages on account of same. Specifically, in support of the measure of damages, the Movants attached to their opening brief an Affidavit of HCFP's counsel, supported by detailed time sheets, itemizing all fees incurred by HCFP, the Trustee, and the Trustee's accountant as a result of all litigation generated by the Doctors' and B & J's filings, a sum which totaled $167,602.50.

However, the time sheets were not limited to the work required as a result of the Doctors' conversion of the Receivables belonging to the estate of PA PC, but rather included all services performed in connection with all of their disputes with the Doctors and B & J, including the Setoff Motion and the Proceeding. After a careful review of these records, we have decided to award the Movants $65,000 in damages to compensate them for the Doctors' conversion of the property of the bankruptcy estate. Of this amount, $60,000 is allocated to necessary professional fees.

Our allocation of the $60,000 among the various professionals is as follows:

| | | |
|---|---|---|
| HCFP | $24,500 | ($20,000 attorneys' fees, $4500 costs) |
| Trustee | $19,000 | ($16,000 attorneys' fees, $3000 costs) |
| Accountant | $16,500 | ($15,000 fees, $1500 costs) |
| | $60,000 | |

In addition, we will award the Trustee $5,000 as compensation for interest expenses incurred by the Trustee, measured by retention of approximately $300,000 belonging to the Trustee for three to six months at six (6%) percent interest due to the failure of Doctors to timely turn over the Receivables to the Trustee. This total figure of $65,000 thus represents our best estimate of the damages caused to the Movants as a result of the Doctors' conduct addressed in the Motion at issue.

■■■ The Movants also requested that punitive damages be imposed on the Doctors. Punitive damages may be awarded in connection with a conversion that is outrageous or because of the defendant's evil motive or reckless indifference to the rights of others in so proceeding. *See Penn Electric Supply Co., Inc. v. Billows Electic Supply Co.,* 364 Pa.Super. 544, 552, 528 A.2d 643, 646 (1987). However, we find here no evidence of any clear intention on the part of the Doctors to stall these proceedings or to frustrate the work of the Trustee, and hence we decline to impose punitive damages against the Doctors.

■■■ In response to the Doctors' other assertions in their post-hearing brief, we refuse to impose a constructive trust to segregate the alleged overpayments made by third party payers to the Doctors due to the lack of evidence presented by the Doctors to support any such order. We also note the total absence of any evidence of fraud, duress, undue influence, mistake, or abuse of a confidential relationship, as is necessary to give rise to any such remedy. *See In re Brady,* 234 B.R. 652, 665–67 (Bankr.E.D.Pa.1999). Finally, we also are unable to ascertain what interest the Doctors have in requesting the imposition of a

constructive trust to any portion of the Receivables, considering that they have no claim themselves to ownership of any of them.

 In regard to the Doctors' request for a collection fee under § 506(c), we note that, to recover under this statutory provision, the Doctors must have demonstrated that (1) the expenditures were reasonable and necessary to the preservation or disposal of the property; and (2) the expenditures provided a direct benefit to the secured creditor, HCFP; or (3) in the alternative, that HCFP expressly consented to or requested same. *See In re Visual Industries, Inc.,* 57 F.3d 321, 325 (3d Cir.1995); *In re C.S. Associates,* 29 F.3d 903, 906 (3d Cir.1994); and *In re Mall One Associates, L.P.,* 185 B.R. 981, 988 (Bankr.E.D.Pa.1995). Bankruptcy courts have construed § 506(c) narrowly and limited its application to expenses that are specifically incurred for the express purpose of ensuring that the secured property is preserved. *See In re Lamont Gear Co.,* 1997 WL 397582, at *7 (Bankr.E.D.Pa. 1997).

In this case, the Doctors' primary motivation was to protect their own practices' interests, not those of HCFP. Any benefit that accrued to HCFP from the Doctors' collection efforts was hence merely coincidental and does not warrant reimbursement under § 506(c). Also, expenses which occurred during periods when collateral should have been returned to a secured creditor are not within the scope of § 506(c). *See In re Heims,* 65 B.R. 112, 117 (Bankr.N.D.Iowa 1986).

We also note that the Doctors first requested compensation for their collection efforts under § 506(c) in their post-hearing brief. Such a request should obviously, if seriously advanced, have been put forward earlier in the proceedings or, alternatively, in a separate motion requesting such fees. However, we must observe that we have considered any possible rights to the Doctors for their collection

services in limiting their damages to $65,-000 as we have, and therefore we would be disinclined to entertain any further § 506(c) motion from the Doctors or B & J even if they were able to meet the requirements for same set forth by the Third Circuit in, *e.g., Visual Industries, supra.*

## D. CONCLUSION

An order consistent with the within result will be entered.