**In re THE ITALIAN OVEN, INC., Debtor.**

**THE ITALIAN OVEN, INC.**

v.

**NO RESPONDENT.**

**Bankruptcy No. 96–25512–JFK.
Motion No. RGS–16.**

United States Bankruptcy Court,
W.D. Pennsylvania.

June 9, 1997.

David W. Lampl, Sable, Makoroff & Gusky, P.C., Pittsburgh, PA, for Debtor.

Neil F. Siegel, Cohen & Grigsby, P.C., Pittsburgh, PA, for Armstrong Restaurants, L.P.

Mark L. Glosser, Pittsburgh, PA, for Committee of Unsecured Creditors.

## MEMORANDUM OPINION

JUDITH K. FITZGERALD, Bankruptcy Judge.

The matter before the court is Debtor's motion for an order authorizing the transfer of liquor license number R–20284 from The Italian Oven, Inc. ("Debtor") to Armstrong Restaurants, L.P. ("Armstrong"). Debtor filed a voluntary chapter 11 on October 21, 1996. Debtor sold most of the assets of its facility located at 2709 West 12th Street, Erie, Pennsylvania, to Armstrong several months before the bankruptcy. The parties agree that the liquor license used by Debtor at that restaurant was not among the assets transferred. Armstrong stated its intention to purchase the liquor license in the original documents, but references to the license were later deleted. In a series of amended documents, Armstrong purchased the right to receive the proceeds of the sale of the liquor license and assumed certain obligations to facilitate the sale. The Official Committee of Unsecured Creditors objects to the motion contending that, because Armstrong failed to perfect a security interest in the license itself, it holds nothing more than an unsecured claim against this estate because the transfer is avoidable under § 544 of the Bankruptcy Code. The Committee asserts that Debtor should be required to mar-

ket the license for the benefit of the estate. Armstrong's claim to the license is based on its argument that, because it would be entitled to the proceeds of the license and there has been no sale which would generate proceeds, it will take the license instead. Armstrong's view is that there is no point in Armstrong paying itself and so the transfer of the license without additional consideration is permissible under the agreements between the parties.

The material facts and the court's jurisdiction are not in dispute. The only issue to be decided is what entitlement, if any, Armstrong has to the license or its proceeds. This Memorandum Opinion constitutes the court's findings of fact and conclusions of law. The parties agree that the chain of events is as follows:

On July 22, 1996, Debtor and Armstrong entered into a Binding Letter of Intent by which Armstrong agreed to purchase all of the Debtor's assets, including its liquor license, for $800,000 plus certain adjustments. The Binding Letter of Intent contemplated that a more formal Asset Purchase Agreement would follow. In accordance with the Binding Letter of Intent, Armstrong paid Debtor $500,000 on July 22, 1996, and Debtor delivered a Bill of Sale to Armstrong dated July 23, 1996. The Bill of Sale transferred the purchased assets. The original documents (Binding Letter of Intent and Bill of Sale) included transfer of the liquor license. Before the Asset Purchase Agreement was executed on August 1, 1996, references to the liquor license in the Binding Letter of Intent and the Bill of Sale were deleted as evidenced by the handwritten strike-outs through the words "liquor license" in both documents. The Asset Purchase Agreement amended the Binding Letter of Intent and the Bill of Sale by deleting the liquor license as one of the assets purchased.[1] The parties agree that the Asset Purchase Agreement and a Side Letter Agreement issued in conjunction with it and dated August 2, 1996, control the transaction. Neither the Asset Purchase Agreement nor the Side Letter

Agreement purport to transfer the liquor license itself. Instead, § 1.4 of the Asset Purchase Agreement contains this provision:

> **Liquor License.** Buyer and Seller agree that Buyer shall be entitled to the proceeds of the sale of Liquor License No. R–20284 held by Seller and heretofore used as [sic] the Erie Restaurant, pursuant to the terms of a Side Letter Agreement between Buyer and Seller.

Asset Purchase Agreement, Exhibit A to Motion for Order Authorizing Transfer of Liquor License No. R–20284, Docket Entry 124 ("Asset Purchase Agreement, Exhibit A").

The Side Letter Agreement provides the details concerning the license. Paragraph 4 states: "Buyer hereby purchases, as part of the Assets, the proceeds of the sale of the License by Seller to a third party." Exhibit B to Motion for Order Authorizing Transfer of Liquor License No. R–20284, Docket Entry 124 ("Side Letter Agreement, Exhibit B"). Certain requirements were imposed on both Buyer and Seller. For example, (1) Debtor would maintain the license in safekeeping for a period of one year with the possibility of extensions, (2) Armstrong would market the license to a third party purchaser, and (3) Armstrong would hold Debtor harmless for failure to effectuate a transfer under certain conditions. Pursuant to the Side Letter Agreement, Armstrong assumed full responsibility for locating a third party purchaser for the license and agreed that it would not unreasonably withhold its approval of either the purchaser or the sale price. Upon receipt of Armstrong's approval, Debtor would file the appropriate application with the Pennsylvania Liquor Control Board (PLCB) to transfer the license to the third party purchaser.

In the motion at bench, Debtor seeks approval of its proposed transfer of the license directly to Armstrong, thereby by-passing the transfer to a third-party purchaser. Armstrong contends that the transfer ought to be approved because, regardless of who

---

1. The original Bill of Sale and the Amended Bill of Sale are both dated July 23, 1996. Armstrong submitted the affidavit of Dru A. Sedwick, Senior Vice President of Jayco, Inc., the general partner of Armstrong. His affidavit establishes that the amendments were actually made on August 1, 1996, when the Asset Purchase Agreement was executed.

purchases the license, Armstrong is entitled to the proceeds of sale. The Committee contends that Armstrong is not entitled to either the license or the proceeds because the sale did not include the license and Armstrong has done nothing to perfect its interest in the proceeds. Thus, according to the Committee, the license should be marketed and sold with the proceeds put into the estate for the benefit of all creditors.

Armstrong advances several arguments in support of its position, none of which are persuasive. It contends that because the liquor license is a general intangible, proceeds from its sale also are general intangibles and thereby are excluded from U.C.C. Article 9 filing requirements. The parties agree that the license is a general intangible. *Tomb v. Lavalle,* 298 Pa.Super. 75, 444 A.2d 666, 667–68 (1981), reargument and petition for allowance of appeal denied (1982). Armstrong also contends that the parties did not intend to create a security interest and that the transactions covered by the Asset Purchase Agreement and Side Letter Agreement constituted prepayment for title to the economic value of the license.[2] Armstrong asserts that it should prevail over other creditors. However, we find that Armstrong cannot prevail vis-a-vis other creditors of this estate.

### Armstrong Does Not Have Possession

Armstrong purchased personalty in the form of the right to future proceeds but did not take actual possession, indeed, *could* not take possession, of the asset which did not then, and does not yet, exist. To defeat the interests of other creditors, Armstrong was required to take possession or otherwise perfect its interest. In the case of *In re H.K. Porter Co., Inc.,* 183 B.R. 96 (Bankr.W.D.Pa. 1995), the court held that the intangible chose-in-action (certain litigation instituted by the Debtor prepetition and assigned to a third party) remained property of the debtor,

not of the assignee, because it was a secret transfer. The court also noted that:

> a buyer who purchases personal property who does not take possession but leaves custody to the seller takes the risk of the seller's insolvency and integrity and no title passes as against the seller's creditors .... a transfer of possession in the sale of personal property, either actual or constructive, must take place so as to give notice to the public in order to transfer title to the purchaser as against innocent creditors.

*Id.* at 102. The court cited *Wendel v. Smith,* 291 Pa. 247, 139 A. 873 (1927), wherein the creditor claimed title to certain automobiles in the debtor's possession. The debtor borrowed the necessary funds to purchase the cars from the creditor. Once the debtor paid for the cars, he transported them to his showroom for sale. The creditor placed a card on the dashboard of the cars stating that he was the owner. The cars, however, remained in the debtor's possession. The court held that placing the tags on the cars did not give the creditor possession of them to the detriment of the debtor's other creditors: physical possession was required to defeat the interests of general creditors.

Armstrong argues that even if it did not have actual possession, it took constructive possession because the liquor license remained on the restaurant premises after Armstrong began its operations. In Armstrong's view, its brief "possession" of the license pending the amended documentation of sale through which Armstrong elected *not* to purchase the license, gave Armstrong "constructive possession" of the proceeds of the sale if and whenever a sale occurs. We cannot stretch the concept of constructive possession that far.

Armstrong also argues that it took constructive delivery of and title to the right to sell the license and the right to receive the consideration paid arising from such disposition.[3] *Armstrong's Reply Brief at 5.* Con-

---

**2.** Armstrong defines the "proceeds" as the economic value, the right to sell the license, and the right to the proceeds of the sale. *See* Reply Brief in Support of Motion for Order Authorizing Transfer of Liquor License No. R–20284 at 2.

**3.** This court has been unable to find any support, and Armstrong has provided no legal authority, for the proposition that proceeds that will be generated as the result of the sale of the liquor license are proceeds of the right to sell the license. The license, with its attendant privilege

structive delivery allegedly occurred because Armstrong agreed to locate a buyer and pay the costs of keeping the license in safekeeping for a year. For purposes of this analysis, the court will assume that these actions were sufficient, as between Debtor and Armstrong, to transfer title to the unrealized proceeds. However, as the court noted in *H.K. Porter, supra,* the "innocent creditors" of this bankruptcy estate were not provided notice of this transaction and, as to them, the secret transfer is of no effect. 183 B.R. at 102. No notice of any purported transfer of future proceeds of a liquor license that was specifically *excluded* from the asset sale was filed of record. The underlying asset of value, *i.e.,* the liquor license, remains in safekeeping in Debtor's name, and is in the constructive possession of Debtor.

 Armstrong did not have possession such that its rights would be protected against third parties' claims. The license, which is in Debtor's name, has not been sold. The license was put into safekeeping, in accordance with the liquor law. Licenses placed in safekeeping are held "for the benefit of the licensee." 47 P.S. § 4–468(b.1). *Cf.,* 40 Pa.Code § 7.31(a) (if license is returned because, *inter alia,* licensee no longer has a lease, the license is invalid as to the premises and is held in safekeeping for the benefit of the licensee for transfer only). Additionally, only the PLCB controls the transfer of a liquor license which must be initiated by application by the licensee, *i.e.,* Debtor. Although the Side Letter Agreement provides in paragraph 3 that "Buyer currently possesses the License, . . . ., and agrees to deliver the same to Seller. . . . Seller shall promptly return the License, . . . , to the PLCB for safekeeping in Seller's name . . . .", it provided only what the facts were at the time, *i.e.,* the license was on the business premises that were operated by Buyer for a

period of about ten days, and what the law requires. Under Pennsylvania law, Armstrong did not buy the license and could not keep it. Further, Armstrong could not buy the right to transfer the liquor license; Debtor, as the licensee, is the only entity eligible to transfer the license upon application to and approval of the PLCB.[4]

*Armstrong Failed to Record An Interest*

Armstrong next looks to the Asset Purchase Agreement which states that it transfers "all of Seller's right title and interest in and to all of its assets of every kind and description . . . and used or to be used in connection with the Restaurants and the operation thereof," § 1.1, Asset Purchase Agreement, Exhibit A. However, Armstrong concedes that the Side Letter Agreement limits this transfer with respect to the liquor license and purports to transfer only the proceeds of any sale of the license. There has been no sale and proceeds did not and do not exist.

 In *In re Kelco Enterprises,* 86 B.R. 471 (Bankr.W.D.Pa.1988), a sales agreement executed prepetition transferred a liquor license to the entity that became the debtor. The total consideration was $26,000, of which $13,000 was paid and $2000 more was due when the PLCB approved the transfer. A promissory judgment note payable over a three year period was issued to cover the remainder. To secure the balance, the sellers also obtained an irrevocable power of attorney by which they would regain ownership of the license in the event that debtors defaulted. A default occurred, the note was accelerated, and the original sellers took steps to regain the license. The transaction was not completed, however, when an involuntary bankruptcy was brought against the debtors. Judge Bentz found that "however innovative the [sellers] were in drafting the

---

to dispense alcoholic beverages, is the asset with value that will generate cash proceeds.

4. The Side Letter Agreement recognizes that only Debtor retained the ability to enter into an agreement to sell the license, with the approval of the PLCB.

Side Letter Agreement, Exhibit B, at ¶ 6 provides:

"Upon Buyer's approval of and consent to a third party purchaser . . . *Seller shall enter into an agreement to transfer the License to the third party purchaser, shall file an application to transfer the License with the PLCB, and shall perform all acts and filings and do all things necessary to effectuate the transfer of the License to the third party purchaser.*"
(Emphasis added.)

power of attorney for purposes of securing the indebtedness, that interest was never perfected by filing the instrument or financing statements in the appropriate locations. As such, the power of attorney is a secret lien and is therefore unenforceable in bankruptcy." *Id.* at 475. The claim was classified as a general unsecured claim. In the instant case the transaction, *i.e.*, the transfer of proceeds, was not completed on the date the bankruptcy petition was filed. Armstrong should have perfected a security interest prepetition. Failure to do so is fatal to its claim.

In *In re Kluchman,* 59 B.R. 13 (Bankr. W.D.Pa.1985), the court found that the Pennsylvania Liquor Code, while providing at the time that a liquor license was not property,[5] permitted a bankruptcy trustee, and, therefore, a debtor-in-possession, "to continue to have certain rights in the license" including "the licensee's related intangible interests in the privilege to be secured or attached if perfected properly". 59 B.R. at 16. In *In re Ultimate Restaurant Group, Inc.,* 144 B.R. 291 (Bankr.W.D.Pa.1992), the court held that a security interest can exist in the proceeds of a liquor license. In *Ultimate Restaurant* the debtor entered into an agreement of sale to purchase Penn Center's liquor license. The parties executed a lease that provided that, among other obligations, the debtor had to sell the license to Penn Center upon termination of or default under the lease. The court held that Penn Center failed to perfect an interest in the proceeds of the liquor license by filing a financing statement and, therefore, its motion to compel transfer of the license would be denied.

Armstrong took no action to record any document purporting to be a financing state-

ment or to otherwise protect its interest against those of the bankruptcy estate. Its theory is that such an action was not required because the transaction was an outright sale by Debtor and constituted prepayment by Armstrong of the as-yet unrealized proceeds, but in either case Armstrong's interest is, in effect, an unenforceable secret lien.[6] Armstrong argues that the filing of a financing statement was unnecessary because the Uniform Commercial Code does not require a financing statement in connection with the sale of a general intangible. In its Memorandum in Support of Motion for Order Authorizing Transfer of Liquor License No. R–20284 it states:

> The Uniform Commercial Code defines "security interest" to include "any interest of a buyer of accounts...." 13 Pa.Cons. Stat.Ann. 9302(a)(5). There is no parallel UCC requirement in connection with the sale or assignment of general intangibles.

*Id.* at 4, n. 2. However, § 9104 lists transactions to which Division 9 of the Uniform Commercial Code does not apply and nothing in that section can be read to exclude general intangibles.

Section 9102(a) (1) of the Uniform Commercial Code states that Article 9 applies "to any transaction (regardless of its form) *which is intended to create a security interest* ....", except as provided in § 9104. (Emphasis added.) Section 9104 is entitled "Transactions excluded from division" and nothing in that section provides an exclusion of general intangibles. Moreover, case authority in this District clearly establishes that creation and perfection of security interests in liquor licenses is governed by Article

---

**5.** The Liquor Code now provides that the license is a privilege between the PLCB and the licensee but constitutes property as between the licensee and third parties. 47 P.S. § 4–468(d).

**6.** Armstrong denies that this arrangement was intended to be any type of loan from it to Debtor. We note, however, that in Debtor's Statement of Financial Affairs in Question 10 describing " 'other transfers', Debtor states that the franchise agreement in question and the accompanying oven lease were transferred for $800,000 plus $300,000 loan advanced against royalty payments." *See also* Asset Purchase Agreement, Exhibit A, at II 2.1(d). The license itself is sched-

uled as having a value in excess of $149,000. Moreover, Debtor's schedules do not support Armstrong's claim to the proceeds. The only claims of Armstrong that Debtor lists in its schedules are certain leases of real estate and equipment. In Debtor's Statement of Financial Affairs, Debtor states that it holds no property for another and that the only transfer to Armstrong are franchise agreements and "accompanying oven leases". There is no mention that the proceeds from any sale of the liquor license are titled in Armstrong or that Armstrong has any claim to the proceeds.

9. *In re Ultimate Restaurant, supra,* 144 B.R. 291; *In re Kelco Enterprises, supra,* 86 B.R. 471.

Article 9 is designed, *inter alia,* to protect the interests of creditors in Armstrong's position, *i.e.,* creditors who purchase interests in property that will come into existence in the future. Parties are not required to create or perfect security interests but fail to do so at the risk of losing what they bargained for when the rights of third parties are deemed by law to be paramount.

Section 1201 defines a security interest as "an interest in personal property ... which secures payment or performance of an obligation...." Armstrong asserts that Article 9 does not apply because the parties did not intend to create a security interest and that Armstrong now has title to the future proceeds of sale. Who has title is irrelevant to the operation of Article 9. Section 9202 provides that Article 9 applies "whether title to collateral is in the secured party or in the debtor." 13 Pa.Cons.Stat.Ann. § 9202. "Debtor" is defined in § 9105(a) as "[t]he person who owes payment or other performance of the obligation secured, whether or not he owns or has rights in the collateral...." In this case, Armstrong did not take possession prepetition and Debtor had an obligation to transfer the license to a third party and pay the proceeds over to Armstrong. In order to perfect its interest in the proceeds against third parties, Armstrong was required either to take possession or to comply with the filing requirements. Having failed to do so, Armstrong is unperfected. *In re Ultimate Restaurant Group, Inc.,* 144 B.R. 291 (Bankr.W.D.Pa.1992) (landlord could not claim perfected security interest in liquor license by relying on terms of lease; failure to file financing statement was fatal). Thus, even if Article 9 were inapplicable to this transaction and Armstrong purchased the title to the proceeds, its interest is avoidable as a secret transfer. *In re H.K. Porter,* 183 B.R. at 102.[7]

Armstrong's assertion that the unrealized proceeds are not property of the estate because Debtor's possession is solely for Armstrong's benefit is without merit and the cases cited by Armstrong are inapposite. Debtor has not yet received proceeds because the license has not been sold. *Cf., In re Joseph B. Dahlkemper Co., Inc.,* 165 B.R. 149 (Bankr.W.D.Pa.1994) (parties' agreement stated that items to be sold were the creditor's exclusive property; proceeds from the sale were to be deposited in an account under their joint control; the proceeds were transferred by the debtor to another account; court held that the creditor's ownership interest was not defeated).

"Proceeds" has a broader meaning for purposes of defining estate property than it has under the Uniform Commercial Code. 5 *Collier on Bankruptcy* § 541.17, at 541–68 (15th Ed. Revised 1997). The liquor license is an asset of this bankruptcy estate because Debtor owned the license on the filing date. By definition, pursuant to § 541(a)(6) of the Bankruptcy Code, proceeds of or from property of the estate, "except such as are earnings from services performed by an individual debtor after the commencement of the case", are property of the estate. 11 U.S.C. § 541(a)(6). Because the license is an estate asset, once it is sold postpetition the proceeds in which Armstrong claims an interest also will be property of the estate. Armstrong may bid on the license if it chooses.

Armstrong suggests that this court should find that Debtor must pay over any proceeds from the sale of the license because if Debtor does not, a breach of contract will result in an administrative claim against this estate. Even if Debtor were in breach, we find Armstrong's contention that its claim would have administrative priority to be without merit. All of the material events occurred prepetition. The sales contract was complete and Armstrong took possession of the restaurant prepetition. A breach of the contract, if any, would give rise, at best, to a general unse-

---

7. Furthermore, § 9306(c) defines the status of a security interest in proceeds and provides that it is "*continuously perfected* ... *if the interest in the original collateral was perfected.*" In this case there was no security interest taken in the collateral (the liquor license) and none in the proceeds.

cured claim against this estate.[8] Even though any breach would occur postpetition, nothing about the breach fits into the category of allowed administrative expenses or priority claims, with the possible exception of the annual safekeeping charge.[9] *See* 11 U.S.C. §§ 503, 502(f), 507. Inasmuch as Debtor is liquidating all of its assets, available funds will be distributed in accordance with the terms of the Bankruptcy Code.

---

8. On this record, Armstrong has not shown that it would have a claim for any damages other than the purchase price of the license because, by its own admission, it purchased only the economic value. Armstrong repeatedly refers to its "right to sell" or "right to dispose". This "right", however, really is an obligation Armstrong assumed to find a buyer for the license. The documents clearly establish that Armstrong was to find a buyer and Debtor was to take the steps necessary to effectuate the sale of the license to a third party and pay the proceeds over to Armstrong. Nothing in the documents of record provides Armstrong with a right to the license itself.

9. *In re Ultimate Restaurant Group, Inc.*, 144 B.R. 291 (Bankr.W.D.Pa.1992), is distinguishable. In that case the debtor defaulted on its rent obligation postpetition. The court held that the lessor had an administrative claim pursuant to 11 U.S.C. § 503(b)(1) for those rent payments in default after the lease was assumed in the chapter 11.