**In re U.S. PHYSICIANS, INC., (Jointly Administered with U.S. Medical Services of Pennsylvania, P.C., U.S. Medical Services of New Jersey, P.C., U.S. Rehabilitation Services of Pennsylvania, P.C., U.S. Medical Services of Delaware, P.A.), Debtors.**

**Orthopaedic Surgery and Sports Medicine, P.C., Orthopaedic Surgery & Sports Medicine Group, P.C., Lewis S. Sharps, M.D., Karl Rosenfeld, M.D., Plaintiffs,**

**v.**

**U.S. Physicians, Inc., U.S. Medical Services of Pennsylvania, P.C., U.S. Rehabilitation Service of Pennsylvania, P.C., U.S. Medical Services of Delaware, P.A., Christine C. Shubert, Trustee, Independence Blue Cross, Keystone Health Plan East, Personal Choice, Aetna/U.S. Healthcare, First State Health, Pennsylvania Blue**

---

Shield, Delaware Care, Donna Shalala, Secretary of the United States Department of Health and Human Service [Health Care Financing Administration, and Xact Medicare], Defendants.

Bankruptcy No. 98–34011DAS.

United States Bankruptcy Court,
E.D. Pennsylvania,
Philadelphia Division.

Aug. 24, 1999.

Gary M. Schildhorn, Adelman, Lavine, Gold and Levin, Philadelphia, PA, for Debtors.

Daniel M. Grauman, Bala Cynwyd, PA, Trustee in U.S. Physicians, Inc. Case.

Christine C. Shubert, Tabernacle, NJ, Trustee on Other Debtors' Cases.

Morton Branzburg, Klehr, Harrison, Harvey, Branzburg & Ellers, Philadelphia, PA, for Trustee Daniel M. Grauman.

Paul B. Maschmeyer, Ciardi, Maschmeyer & Karalis, PC, Philadelphia, PA, for Trustee Christine Shubert.

Walter Weir, Jr., Bonnie R. Golub, Weir & Partners LLP, Philadelphia, PA, for Plaintiffs.

Henry DeWerth–Jaffe, Pepper Hamilton & Scheetz, Philadelphia, PA, for HCFP Funding, Inc.

Michael Migliaccio, Morgan, Lewis & Bockius LLP, Philadelphia, PA, for Independence Blue Cross, Keystone Health Plan East, and Personal Choice.

K. Tia Burke, Christie, Pabarue, Mortensen & Young, PC, Philadelphia, PA, for Pennsylvania Blue Shield.

James Matour, Middleman & Matour, PC, Philadelphia, PA, for Aetna/US Healthcare.

Brenda Pierce, Christiana Care Health Services, Wilmington Hospital, Washington, DE, for First State Health.

Mark Felger, Cozen & O'Connor, Philadelphia, PA, for Delaware Care.

Virginia R. Powel, Ass't. U.S. Attorney, Philadelphia, PA, for Donna Shalala.

Frederic Baker, Ass't. U.S. Trustee, Philadelphia, PA, United States Trustee.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION

The instant adversary proceeding ("the Proceeding"), which originally asserted many claims against numerous parties, has boiled down to another in the series of attempts of former member physicians to separate themselves from the affiliated Debtors upon the failure of the Debtors' effort to form a large consolidated medical practice group in order that these physicians can collect their receivable from as early a date as possible. We conclude that, while the instant physicians went further in the exercise of their repurchase efforts than the physicians at issue in our prior decisions reported as *In re U.S. Physicians, Inc.*, 236 B.R. 593 (Bankr.E.D.Pa. 1999) ("*USP II*"); and 235 B.R. 367 (Bankr.E.D.Pa.1999) ("*USP I*"), having issued notice of their intention to separate as well as returning promissory notes to the Debtors, nevertheless they fell short of their goal of taking all actions specified in the final agreement between the parties to effect a final termination of the sale process. The agreement also required the instant physicians to receive their stock certificates from the Debtors upon delivery of the canceled promissory notes, which did not and could not possibly have occurred in a short time-period, to finalize the separation. We hold that the mutual belief of the physicians and the Debtors' counsel that a separation occurred does not, under the principles developed in *USP II*, at 598–601, save the physicians from their failure to meet all of the agreement's terms against the claims of the Trustees that the separation was not finalized. We therefore find, as we did in the factual settings presented in *USP I* and *USP II*, that the Trustees retain the rights to collect the Debtors' disputed accounts receivables generated by these physicians.

### B. FACTUAL AND PROCEDURAL HISTORY

U.S. PHYSICIANS, INC. ("USP") filed a voluntary Chapter 11 bankruptcy case on October 30, 1998. From the outset, this case was jointly administered with cases of four of USP's affiliated companies, U.S.

MEDICAL SERVICES OF PENNSYL-VANIA, P.C. ("PA PC"); U.S. MEDICAL SERVICES OF NEW JERSEY, P.C.; U.S. REHABILITATION SERVICES OF PENNSYLVANIA, P.C.; and U.S. MED-ICAL SERVICES OF DELAWARE, P.A. (collectively, "the Debtors"). All five cases were converted to Chapter 7 cases on November 9, 1998. Christine Shubert, Esquire, was appointed as interim trustee of all five Debtors on November 10, 1998. Daniel Grauman (with Shubert, "the Trustees") was elected as the permanent Chapter 7 trustee in the USP case on April 12, 1999, while Shubert remains as trustee in the other four cases.

LEWIS S. SHARPS, M.D., KARL RO-SENFELD, M.D., ORTHOPAEDIC SURGERY AND SPORTS MEDICINE ("OSSM"), and ORTHOPAEDIC SURGERY AND SPORTS MEDICINE GROUP ("OSSMG") (collectively, "the Plaintiffs"), burst into these cases by filing the Proceeding on March 23, 1999, along with a motion for a Temporary Restraining Order ("TRO") and a Preliminary Injunction ("PI"). The Complaint names thirteen Defendants, including four of the five Debtors and Shubert ("the Debtor Defendants"); and eight parties who received services from the Plaintiffs, *e.g.*, INDEPENDENCE BLUE CROSS, KEYSTONE HEALTH PLAN EAST, PERSONAL CHOICE (these three parties are collectively referenced as "IBC"); and, in addition, AETNA/US HEALTH-CARE, FIRST STATE HEALTH, PENNSYLVANIA BLUE SHIELD, DELAWARE CARE, and DONNA SHALA-LA, THE SECRETARY OF THE UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES (all eight of these parties are collectively referred as "the Payer Defendants"). It recites twenty-six counts, asserting claims of conversion, unjust enrichment, and breach of contract against each of the Payer Defendants; conversion, unjust enrichment, and interference with contractual relations against the Debtor Defendants; and prayers for injunctive relief and an accounting

from all of the Defendants. Essentially, the claims were that the Plaintiffs were not receiving payment for services to which they were allegedly entitled. The TRO and PI were sought to attempt to realize the entire scope of injunctive and accounting relief as soon as possible.

We entered an order on March 23, 1999, summarily denying the TRO as not presenting matters which demand such urgent action, but scheduling a hearing on the PI motion on April 5, 1999. On April 5, 1999, a hearing was conducted on that motion at which the sole witness was Dr. Sharps. At its conclusion, we indicated that the only relief that we were inclined to provide was to issue an order, after input from all interested parties regarding its form. This order, ultimately entered on April 13, 1999, required the Payer Defendants who received services from the Plaintiffs to submit a detailed accounting, by April 30, 1999, of all claims submitted, under either of the two provider numbers at issue (as described at pages 107–108 *infra*), covering services rendered during the period from March, 1997, through March, 1999. We also indicated an intention to go forward with the final trial of the Proceeding on the original Summons date, May 4, 1999.

Thereafter, the parties, while filing numerous pleadings, including a motion to have this court abstain from hearing the claims asserted in the Proceeding against it by IBC, requested and secured continuances in order to effect certain settlements. In the interim, the Payer Defendants and the Plaintiffs entered into a Stipulation, approved by us on June 25, 1999, by which the Payer Defendants agreed to remit all sums due under the two provider numbers at issue after November 8, 1998, to the Plaintiffs. That Stipulation further provided that any disputes regarding precise sums due would be tried on July 14, 1999.

On July 14, 1999, the Plaintiffs reported that all disputes with the Payer Defendants had been resolved and this further

resolution would be embodied in a second Stipulation. That Stipulation has not yet been filed, but is reportedly in the process of execution. The only disputes not resolved were the rights of the Plaintiffs against the Debtor Defendants to certain accounts receivable generated by the Plaintiffs' practice.

To make the record for resolving this dispute, the parties stipulated that they would merely add a short oral stipulation to the testimony and exhibits from the PI hearing of April 5, 1999, and a hearing of April 29, 1999, on the motion decided in *USP I*, which had been prosecuted by different doctors represented by the same counsel as the Plaintiffs. This plan to avoid further testimony weakened as the parties discussed the oral stipulation, and eventually two witnesses were called, Dr. Sharps and John Hogan, Esquire, the former general counsel to USP, who had testified on April 29, 1999. Following the hearing, we entered a scheduling order permitting the submission of Plaintiffs' opening brief by July 23, 1999, followed by the Trustees' brief by August 6, 1999, and a reply brief from the Plaintiffs by August 16, 1999.

The consolidated record details the transaction by which OSSM was acquired by USP, and later altered to suit USP's business needs. In that transaction, Drs. Sharps and Rosenfeld ("the Physicians"), the controlling shareholders of OSSM, a Pennsylvania professional corporation, sold the stock of their orthopaedic practice to USP, a business corporation, by means of a Stock Purchase Agreement of March 21, 1997 ("the SPA"). The SPA provided that the sale was contingent upon USP's achievement of an investment benchmark of $30,000,000 to fund its consolidated practice group by September 30, 1997. The SPA further provided that, if USP could not raise the benchmark funding by the specified date, either through a contemplated public stock offering ("the IPO") or via alternative financing vehicles, the parties anticipated they would undo the sale, permitting the Physicians to regain all their OSSM stock and assets and return to practice outside the USP network as if no sale had ever taken place.

Unfortunately, not long after the SPA was closed, USP discovered a technical problem in the acquisition process. Under Pennsylvania law business corporations are not permitted to purchase the stock of professional corporations. However, a business corporation may elect to become a professional corporation. Recognizing that its OSSM acquisition could be validated by the application of latter principle, counsel for USP structured a repair in July, 1997 by filing an amendment to the articles of incorporation of OSSM to convert it to a business corporation. Counsel for USP then secured signatures from the appropriate parties ratifying and reaffirming USP's purchase of OSSM's stock.

Prior to this, USP had already been operating in Pennsylvania through another professional corporation, but it found it to be advantageous to use OSSM's service provider and tax numbers ("the Old Numbers") for all services provided in Pennsylvania, not just those performed by OSSM's orthopaedic practice. The Old Numbers were hence deemed valuable because they were an immediate vehicle for securing payment from third party payers in Pennsylvania, such as the Payer Defendants, because this avoided delays which would have ensued had USP applied for new numbers. The Old Numbers also included favorable negotiated rates for payment tied directly to them, thus avoiding the risk of having to settle for a lower percentage payment should USP implement new numbers.

USP needed a vehicle it could use as a professional corporation for billing medical treatments provided in Pennsylvania, while taking advantage of OSSM's Old Numbers. To accomplish this, USP took one of its subsidiaries and merged it into OSSM. OSSM was chosen as the surviving entity, its stock was canceled, and new stock was issued as a professional corporation in the

name of PA PC. This merger answered USP's needs, but was to have repercussions on the relationship between the Physicians and USP.

Thereafter, PA PC was free to channel requests for payment through the Old Numbers, and did so for many different physicians, not only those providing services through the former OSSM practice. Unfortunately, as a result, significant billing confusion arose. Third-party payers, familiar with the Old Numbers as belonging to OSSM, began forwarding payments to the OSSM offices for all services billed on those numbers, regardless of which physician practice had actually treated the patients. In effect, the OSSM offices became an accounting clearinghouse for money due to USP that was generated not only by OSSM's own former practice but also by other medical practices associated with the Debtors.

Recognizing that it was receiving payments for services it had not rendered, OSSM opened an escrow account into which it deposited those payments not able to be matched to its own records of patients treated. Furthermore, the Physicians became uncertain whether they were receiving all of the money that was properly due to them, since it was clear that there were intermingled billings with other practices and mismatched funds. The Proceeding was initiated in part to clear up these problems. The negotiated and partially memorialized settlement of all disputes between the Plaintiffs and the Payer Defendants manifests the success of this purpose of the Proceeding. Other facts are significant to the remaining disputes which we must decide.

USP's contingency date for obtaining funding, not having been accomplished by September 30, 1997, was extended by the parties' agreements to December 31, 1997, and later to May 14, 1998. However, no IPO and no alternative financing was ever obtained. Consequently, the Physicians sought to exercise their right to repurchase the stock of their former practice,

notifying USP by letter dated June 15, 1998, of their intention to terminate the SPA, effective June 18, 1998. USP responded by letter dated June 17, 1998, in which it authorized OSSM to conduct all billing, posting, and collection activity through OSSM's offices and under OSSM's control. Further, on July 1, 1998, USP notified the employees Of OSSM that their employment with USP was terminated as of June 23, 1998. Upon notice of the termination of their relationship with USP, the Physicians created a new professional corporation known as OSSMG in July, 1998; obtained a new Employer Identification Number; and applied for a new Medicare Provider Number ("the New Numbers"). However, OSSMG did not obtain the New Numbers until December, 1998. And, notwithstanding these actions, PA PC never relinquished its use of the Old Numbers.

Despite the seeming intention expressed by the Physicians in June to completely sever their relationship with USP at that point, hope still apparently persisted that the IPO or alternative funding could be obtained by USP. Therefore, discussions and negotiations continued, leading to the execution of a Third Amendment to SPA of July 10, 1998 ("the Third Amendment"). The Third Amendment provided, in pertinent part at ¶ 21, as follows:

(b) If on or before September 30, 1998, USP fails to obtain gross proceeds of $30,000,000 (the "Contingency") by closing (i) an initial public offering of the Common Stock of USP (the "IPO"), or (ii) a private placement of the Common Stock of USP (the "Private Placement"), or (iii) a financing transaction other than an IPO or Private Placement (the "Private Financing"), then on October 1, 1998, the Purchase Agreement and the Employment Agreements between USP, the Company and the Physicians shall automatically be deemed NULL AND VOID ... all amounts of principal and interest due on the Notes shall no longer remain due, the Notes shall be delivered

by Physicians to USP on or before October 15, 1998 marked "Satisfied and Cancelled" along with any Common Shares issued to date, if any, and Physicians shall reclaim ownership of all of their shares and all accounts receivable then outstanding in accordance with subparagraph 21(e)(i) below. In such event, no further payments shall be due to USP by the Physicians or the Company. The Physicians shall jointly and severally be responsible and serve as surety and guarantor that the required items are timely delivered.

. . .

(e) In the event the Physicians reclaim ownership of their shares, USP shall convey to the Physicians the stock certificates issued to USP representing all outstanding shares of common stock of the Company, in negotiable form.

(i) As of the date of any such conveyance, the assets of the Company shall include substantially those assets of the Company as of the date of the conveyance and all then outstanding accounts receivable attributable to the professional services provided by the Physicians and clinical staff members practicing at the locations at which the Physicians provide professional services. . . .

USP failed to consummate the IPO or the acquisition of any alternative funding by October 1, 1998. Therefore, on that day, the Physicians, through their counsel, forwarded the Notes referenced in the Third Amendment to USP, duly marked "Satisfied and Cancelled." Having followed all the steps required of them to effect the repurchase, the Physicians believed and behaved as if a return to presale status quo had been achieved. Hogan testified that he, too, believed that the Physicians had taken all necessary steps on their part to terminate the parties' relationship. However, as he noted, a "corporate formality of unwinding" the parties' sale transaction was still necessary to finalize the termination process.

For one thing, there remained the lingering problem of the intermingled payments still being channeled through the Old Numbers. Thinking it had effectively extricated itself from the USP venture, OSSM believed it had a right to reclaim all of its assets, including the Old Numbers. For another, neither USP nor PA PC delivered any stock certificates to any of the Plaintiffs, it having become unclear which entity would do so.

The bankruptcy cases were filed within about a month after October 1, 1998. Shubert, seeking to maximize estate assets in the normal course of bankruptcy administration upon her appointment, issued notices of the filing and effect of the automatic stay to all creditors on or about November 13, 1998, including the Physicians. On December 16, 1998, having apparently learned of the "dual" tax/provider numbers, Shubert issued a letter directing that payments referencing the New Numbers cease and requesting that payments revert to the Old Numbers.

The result of these directives was confusion on the part of the Payer Defendants, which the Proceeding appears to have rectified. However, a contest still remains regarding the ownership of OSSM's assets in the period preceding the bankruptcy filing and the conversion of the case to Chapter 7. The most significant asset at issue is accounts receivable of OSSM generated during this period from October 1, 1998, through October 30, 1998, or possibly November 8, 1998.

## C. DISCUSSION

The substantive issue remaining for resolution in the Proceeding is therefore very much like the underlying substantive issue presented in *USP II*, although it is presented in a somewhat more complex factual setting and in a different procedural setting. The Plaintiffs are another in the series of medical practices which sold their assets to the Debtors and are now arguing that they completely extricated themselves from the Debtors' affairs prior to their

**110**

bankruptcy filing. Like the physicians in *USP II*, but unlike those in *USP I*, the medium by which the sale of the Physicians' assets to USP was effected was by a stock transfer. Unlike the *USP II* physicians, the Plaintiffs do not base their claims on their having retained a valid security interest in their stock, *comparé USP II*, at 600–605, and they do not invoke 11 U.S.C. § 362(d). *Compare id.* at 604–605. Perhaps wisely, they simply argue, as the *USP II* physicians in the last analysis were forced to do, *see USP II*, at 597–598, that the re-transfer occurred pre-petition and that the Debtors therefore had no interest in their stock at the time of their filing.

Not having the benefit of the *USP II* decision when preparing their opening brief, the Plaintiffs therein argued that the assets at issue, the accounts receivable of their practice earned for pre-petition services, were not property of the Debtor's estate because ¶¶ 21(b) and 21(e) of the Third Amendment allegedly unambiguously stated that the SBA became "null and void" on October 1, 1998. They also rebut an argument not ultimately in fact made by the Debtor Defendants that the Third Amendment was an executory contract which the Trustees could reject.

The Trustees did have the benefit of the *USP II* decision in preparing their brief, although it was not utilized as prominently as might be expected, perhaps because the brief was prepared before this decision was entered. The Trustees therefore argue as follows: (1) the Plaintiffs never regained title of the OSSM/PA PC stock, as contemplated by ¶ 21(e) of the Third Amendment; (2) without title to the stock, the Plaintiffs failed to perfect their right to recover the disputed accounts; (3) furthermore, OSSM/PA PC, which was not a party to the Third Amendment and therefore was not bound by its terms, was the entity whose stock the Physicians were required to obtain to finalize the re-transfer. The Trustees acknowledge that the OSSM/PA

PC stock was not yet issued and hence was incapable of delivery, but argue that this factor merely manifests that the requisite "unwinding" process which was required to take place before the re-transfer process was finalized had not yet transpired.

In their reply brief the Plaintiffs do not cite or refer to *USP II*, nor do they attempt to distinguish its possible application to the instant facts. Instead, they chastise the Trustees for failing to acknowledge the testimony of not only Dr. Sharps but also that of USP's former counsel Hogan that both parties considered the re-transfer final as of October 1, 1998. They reiterate that language of ¶ 21(b) which renders the SPA "null and void" if the IPO or other comparable financing is not received by October 1, 1998.

The determinative issue is a very narrow one of interpretation of ¶¶ 21(b) and (e) of the Third Amendment: do they express an intention to cause the re-transfer to be completely final on October 1, 1998, or do they express an intention to suspend finality until the Physicians recover the shares of their former corporation from USP? We find that the issue is a close one, certainly as compared to the similar facts presented in *USP II*.

We favor the position of the Trustees. This result is consistent with the underlying holding of *USP II* that, in order to recover all rights in their stock, it was necessary for physicians to establish that every step referenced in the applicable contracts as necessary to be taken to undo the stock transfer must have been in fact taken. *See USP II*, at 598–601. The Debtors' arguable acquiescence in the position that contractual conditions to undo the transfers need not be performed cannot be binding on the Trustees. *Id.* at 599–600. In light of our decisions in *USP I* and *USP II*, the fundamental bankruptcy principle of assuring equal treatment of all similarly-situated creditors is served by a decision favorable to the Trustees. The rea-

soning of *USP II*, at 598–601, is expressly incorporated herein.

▋ It is a general principle of Pennsylvania law, as the Trustees argue, that recovery of the stock of a corporation is a prerequisite to the exercise of control over that corporation's assets. *See In re Italian Oven, Inc.*, 209 B.R. 355, 359–60 (Bankr.W.D.Pa.1997); and *Wagner v. Hart Chemical Co.*, 409 Pa.Super. 289, 198–304, 597 A.2d 1208, 1212–15 (1991), *appeal denied*, 533 Pa. 601, 617 A.2d 1275 (1992). It is not a mere technicality which can be implicitly waived.

The Third Amendment must be read in this light. As we read the pertinent subparagraphs of the Third Amendment, quoted at pages 108–109 *supra* in full, this legal principle, far from being repudiated or modified, is recognized and reiterated therein. While ¶ 21(b) provides that the Sale agreement will "automatically be denied NULL AND VOID" upon USP's failure to obtain the requisite finding, that same subparagraph recognizes the requirement that the pertinent common stock shares must be returned to the Physicians to effect the re-transfer. It is only upon receipt of that stock that they would "reclaim ownership of all of their shares and accounts receivable than outstanding in accordance with subparagraph 21(e)(i)." Subparagraph 21(e)(i) provides that only "[a]s of the date of any such conveyance" of the common stock shares to the Physicians do the assets, including accounts receivable, become assets of the Physicians.

We might be inclined to soften or read out the stock transfer requirement if the Debtors had been guilty of conduct which might equitably estop them from arguing that the stock transfers, which it was their duty to accomplish, were totally unnecessary to the consummation of the cancellation of the sale transaction. However, there is no evidence of any communications from Hogan or any other agent of the Debtors to the Physicians after October 1, 1998, which would have constituted any requisite false representation or conduct which they intended to induce the Physicians to act upon to their detriment. *See In re Webb,* 99 B.R. 283, 290 (Bankr. E.D.Pa.1989); and *Novelty Knitting Mills, Inc. v. Siskind,* 500 Pa. 432, 435–36, 457 A.2d 502, 503–04 (1983).

In truth, between October 1, 1998, and late October or early November, there was apparently simply not enough time for Hogan and his associates to complete the "corporate formality of unwinding" the sale transaction. As the Trustees point out, the stock would have had to come from PA PC, which was not a party to the Third Amendment. We also note that, as of the date of the execution of the Third Amendment on July 10, 1998, the merger of OSSM and PA PC was about a year old. Therefore, at the time of the execution of the Third Amendment, the parties knew or should have known that the transfer of the shares to OSSMG could not take place over night. As the Trustees point out, OSSM/PA PC probably should have been made a party to the Third Amendment to render its terms for the stock transfer enforceable.

By November 13, 1998, Shubert had made clear that she perceived the stock re-transfer to not have been consummated. From that time forward, the Plaintiffs were on notice that Shubert and later both Trustees claimed a right to the assets at issue and had to be guided accordingly.

We therefore conclude that the rights of the Debtor Defendants to the disputed assets of the Plaintiffs' practice(s) are superior to those of the Plaintiffs. We do confess some degree of uncertainty as to whether the Trustees' claims relate to only pre-petition accounts receivable or are also meant to embrace post-petition, pre-conversion accounts. We also have no information in the record regarding the amounts of the accounts in dispute. Our accompanying order is therefore somewhat vague on these points, assuming that the parties will return to this court, by a timely motion for reconsideration or any other

appropriate procedural device, if the parties are unable to resolve among themselves these and any other matters left undecided by this Order.

### D. CONCLUSION

An order as described within will be entered.